**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Thomas J. AYCOCK, Jr., an individual, d/b/a Vita Foods, Respondent.**

**No. 20653.**

United States Court of Appeals Fifth Circuit.

May 15, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Janet A. Kohn, Edith Cash, Attys., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Allison W. Brown, Jr., Peter M. Giesey, Attys., N. L. R. B., for petitioner.

David A. Bartholf, Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before GEWIN and GOLDBERG, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

Thirty-six months ago and about forty volumes back in the Federal Reporter, our relatively simple per curiam opinion, we thought, had ended this case.[1] National Labor Relations Board v. Aycock, 5 Cir. 1964, 328 F.2d 314. Compliance with the reinstatement order which we there enforced, however, has spawned a more complicated question which we now must answer.

We state the facts relevant to the present action. Thomas J. Aycock, Jr., the respondent, owns and manages a Jacksonville, Florida, business known as Vita Foods. Vita makes and sells jellies, preserves, mayonnaise, and salad dressing, and packs prune juice. Aycock employs 20 to 25 people in this business.

During a union organizational campaign in 1961, the Board subpoenaed John Mathis, a Vita employee, to testify at a hearing. Mathis went to the hearing, which was held on April 27. On April 28, the respondent transferred Mathis from his position as capping machine operator to that of cook's helper, a more odious job at the same rate of pay.

On May 11, the union filed charges that this transfer violated § 8(a) (1), (3), and (4) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. On June 8, Mathis was offered the position of truck driver, again at the same rate of pay. When this offer was made he was asked by John Chancellor, the plant superintendent, whether he had a driver's license. Mathis replied that he had one and accepted the position. On July 26–28, the Board held a hearing on the unfair labor practice charges. (There were other § 8(a) (1), (3), and (4) charges besides those concerning Mathis.)

---

1. The complete text of the opinion follows:
"PER CURIAM:
This Petition by the Board to have its Order enforced presents only factual issues. We find that there was sufficient evidence on the record as a whole to sustain the Board's findings that the Respondent violated Sections 8(a) (4), 8(a) (3), and 8(a) (1) of the Act.
It is therefore ordered that the Board's Order be enforced."

Mathis held the truck driver's job without incident until Friday, September 22. On that date the union election was held, which the union lost 13–10. Later in the day, after the election, Mathis was told to deliver certain Vita products to two customers. Mathis opined that it was so late in the afternoon that Setzer, one of the customers, would not take delivery. Chancellor told Mathis to attempt the delivery anyway. Mathis made the attempt, but was told by Setzer that delivery would not be accepted.

Mathis then proceeded to the second customer, but the truck was loaded in such a fashion that the Setzer order had to be unloaded before the other order could be reached. After the latter was unloaded, Mathis and his helper reloaded the Setzer order and drove back to the Vita plant. Upon Mathis' return, it appeared that the Setzer order in the back of the truck had been jostled about. The packages were in disarray; some were damaged and some of the glass jars containing jelly had been broken. Aycock berated Mathis in strong terms for his apparent negligence, but nothing further happened at that time.

Mathis testified that on Monday morning, upon reporting to work, he told Chancellor that he did not want to drive the truck any more because he had not liked the way Aycock had talked to him. Chancellor replied that both Mathis and Aycock were tense over the union problem. Then, Mathis delivered the Setzer order; on his return he spoke to Aycock. Aycock said he thought Mathis' attitude was not satisfactory, and asked Mathis to show him his driver's license. Mathis replied that he had left his license and wallet at home. Aycock told Mathis that he could not drive the truck without a license and drove Mathis home to pick up the license. Mathis, after remaining in his house for about fifteen minutes, came out and said that his wallet had been stolen and that the license was in it. Aycock drove back to the plant, where Mathis asked permission to punch out and go to get a "duplicate" license. Aycock granted the permission, and Mathis left. He did not return to work. He did come back to the plant the next Friday, but only to pick up what pay was due him. Mathis testified that he thought Aycock had fired him when they returned from Mathis' search at his home for the license, even though a few minutes later Mathis requested and was given permission to get a duplicate. It later appeared that Mathis' driver's license had expired long before the period relevant to this action, and that Mathis was at all times aware of that fact.

After leaving Vita, Mathis held a series of lower-paying jobs, generally earning less than he would have had he remained as a truck driver with Vita.

On November 13 the Trial Examiner held that the transfer of Mathis from his original capping machine operator's position to that of cook's helper violated § 8(a) (1), (3), and (4), and ordered reinstatement. Even though Mathis had been transferred from the cook's helper's position to the truck driver's position more than a month and a half before the July, 1961, hearing, and even though this was known to the parties and the Examiner at the hearing, the question of whether that transfer constituted reinstatement within the meaning of the Act was not then litigated.[2]

The Board affirmed the Trial Examiner on February 28, 1962; precisely two years later we enforced the Board's hold-

2. The Trial Examiner's decision states that that question was specifically left open:

* * * [T]here may be no need for a recommendation that Mathis be made whole. Moreover, the record indicates that Mathis, as a truckdriver, may have received an increase in wages by now and, therefore, he may not desire reinstatement in the job of capping machine operator. Nevertheless, because

I do not know whether Mathis (1) sustained a loss in earnings after the hearing and (2) prefers to continue as a truckdriver, I shall recommend the usual reinstatement and back pay order. The simple act of asking those two quite obvious questions at the July, 1961, hearing would have simplified, if not obviated, the present action.

ing. Less than a month after our decision, on March 17, 1964, Mathis accepted Aycock's offer of a case-sealing job as "reinstatement."

The present action arose from the controversy over the back pay due Mathis for the period from April 28, 1961 (when he was made a cook's helper) to March 17, 1964, when he was "reinstated."

The Trial Examiner in the present action found, and the Board agreed, that Mathis' acceptance of the truck driver's job did not constitute reinstatement. The Trial Examiner also found, however, that Mathis voluntarily quit the truck driver's position, that this quitting tolled the respondent's back pay liability, and that the total back pay owed Mathis was $2.50. The Board disagreed on this point, holding that Mathis' quitting was a consequence of the original discrimination and was therefore justified. The Board concluded that respondent's back pay liability was not tolled and assessed the back pay owed Mathis at $2,848.54, with 6% interest. The Board petitions for enforcement.

We agree that the truck driver's job was not reinstatement within the meaning of the Act. We hold, however, that the Board erred in finding from the record that Mathis' departure from the truck driver's job was a consequence of the respondent's discrimination. We agree with the Trial Examiner's finding that the quitting was voluntary and unrelated to the discrimination and that it tolled the back pay liability of the respondent. We grant enforcement of the back pay order only to the extent of the $2.50 award, plus interest, as found due by the Trial Examiner.

We deal with the issues in order of increasing difficulty.

■ The Trial Examiner found, and the Board agreed, that Mathis' ac-

ceptance of the truck driver's job did not constitute a reinstatement within the meaning of the Act. We agree. Substantial evidence on the record as a whole supports the conclusion that the duties of the two jobs were dissimilar. Compare Barker's East Main Corp., 1962, 136 NLRB 494, 503–4. That their pay was the same is not sufficient.[3]

With regard to back pay, the Board's position vis-a-vis its trial examiner is somewhat unclear. The general counsel appears to contend alternatively: first, that the trial examiner was incorrect in his finding of fact that Mathis left the truck driver's job for personal reasons not connected with the prior discrimination. The general counsel claims that Mathis was actually or "constructively" discharged for reasons attributable to the discrimination, using the following argument: The cook's helper's job was so odious that to escape it Mathis was willing to take a job for which he was unqualified; for this reason he took the truck driver's job even though he had no driver's license. When his employer discovered this lack of qualification Mathis lost the truck driver's position. Therefore, Mathis' departure from the truck driver's job was a direct result of his having justifiably sought escape from the cook's helper's job.

The trouble with this argument is not its reasoning but its factual underpinning. The Trial Examiner did not find that Mathis lost the truck driver's job because he was unqualified for it; he did find that Mathis walked off the job because "he knew he had lied to his employer as regards his driver's license, which fact played upon his conscience to such an extent that inwardly he was persuaded to leave his job with the respondent and thus avoid further discussion in this regard with either Aycock or Chancellor, and thus, temporarily at least, satisfy his inner self."

---

3. If Vita wished to show that at the time of the transfer the capping machine operator's job was unavailable for a valid reason, it had the burden of going forward with the evidence, which burden it did not meet. NLRB v. Mastro Plastics Corp., 2 Cir. 1965, 354 F.2d 170, 176, cert. denied, 1966, 384 U.S. 972, 86 S.Ct. 862, 16 L.Ed.2d 682.

In other words, the Trial Examiner found that the gist of the reason for Mathis' departure from his job did not concern his lack of qualification but rather his desire not to confront his superiors after having been exposed in a knowing lie about the license. The Trial Examiner pungently explained his conclusion that Mathis voluntarily left work without being fired, or "constructively discharged":

"In all the circumstances discussed, described, and found above, I, after long and careful consideration, am convinced and find that Mathis *misinterpreted* what Aycock said to him in their conversations on Monday, September 25, 1961, and that Aycock did not discharge Mathis at the time in question. The resolution of the issue as to the credibility of the witnesses Mathis and Aycock has been most difficult, and has caused me grave concern for reasons which should be obvious to all concerned herein. For example, Mathis' testimony that he had a valid driver's license at all times material herein, which he later *admitted* was false, but qualified his admission by testifying to the effect that he had had a license but had let it run out, 'quite a while back.' In other words he knew at the time he was telling Aycock that he had left his license at home and similar folderol, as set forth hereinabove, that he was lying. Such testimony by a witness would perturb any conscientious trier of the facts, either in administrative hearings or any other tribunal. A further perturbing factor was Mathis' testimony that he considered that he was discharged, yet on the very day that he said it occurred and a few minutes thereafter *he requested time off from Aycock to go to the courthouse and get a renewal of his license,* which was granted him, he went over to the timeclock and checked out. When this factor is considered in the light of the further fact that there is no evidence in the record that he demanded the wages due him at the time or that the Respondent offered them to him, which is the universal custom in discharge cases, but the record does show that he went to the plant on the next payday and was paid the wages due him, in the same mode and manner that other employees of the Respondent were paid their wages on regular paydays. Another factor that has likewise perturbed me is that there is no evidence in this record that Mathis ever at any time reported his discharge to either the Charging Union herein or to the Board itself. This factor alone causes one to look askance at the General Counsel's alternate contention that he was discriminately 'constructively discharged' on or about September 25, 1961. When this factor is considered in the light of the fact that the alleged discharge occurred less than 2 months after the original hearing herein before Trial Examiner Hunt, on July 26, 27, and 28, 1961, another perturbing question arises and causes one to wonder and to further ponder whether in such an atmosphere any employer, including the Respondent herein as a matter of everyday common-sense engage in the tactics alluded to it by the General Counsel at the hearing herein and in his brief. In such circumstances I am convinced and find that Mathis' own conduct at the time in question was the major contributing factor to the creation of the issues we are confronted with herein." [emphasis in original]

After assessing the evidence and the credibility of the witnesses, the Trial Examiner concluded that Mathis voluntarily and unilaterally left his job, without being forced by circumstances to quit. This is not an anomalous or impossible conclusion: even though Mathis may have accepted the truck driver's position as the result of Hobson's choice, that in itself does not foreclose the possibility that he left the respondent for reasons unconnected with the prior discrimination or his own lack of qualification. The Trial Examiner obviously believed

that the credible evidence did not show that Mathis would have had to leave employment with the respondent had he not lied and then quit.[4] The Board brushes these findings aside, substituting its own finding.

In our choice of the Board's or the Examiner's explanation of the reason which caused Mathis to leave his job, we are forced to navigate between the scylla of overattention to the Trial Examiner's factfindings and the charybdis of overextension of the Board's expertise. Our guides to these waters are Universal Camera v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and its explicatory descendants. This is no problem of the economics or sociology of labor-management-relations, areas where experts hold sway and where the uninitiated and inexperienced should hesitate to speak. We need only know who was telling the truth. The Board was as far removed from the hearings as this Court. Are we nonetheless to hold that in such an analysis of testimony the Board is more perceptive than the Trial Examiner, who took part in the proceedings?

On remand from the Supreme Court in National Relations Board v. Universal Camera Corp., 2 Cir. 1951, 190 F.2d 429, 430, Learned Hand illuminatingly advises:

"The Supreme Court vacated our order and remanded the cause to us for reconsideration in two particulars. * * As to the first, the Court agreed that in the case at bar we had based our review upon the whole record, but it held that the amendment had been a resultant of prolonged discussion in both Houses; and, although in form it did no more than incorporate what had always been the better practice— our own included—it was intended to prescribe an attitude in courts of appeal less complaisant towards the Board's findings than had been proper before; not only were they to look to the record as a whole, but they were to be less ready to yield their personal judgment on the facts; at least less ready than many at times had been. Presumably that does not extend to those issues on which the Board's specialized experience equips it with major premises inaccessible to judges, but as to matters of common knowledge we are to use a somewhat stiffer standard. Just where the Board's specialized experience ends it may no doubt be hard to say; but we are to find the boundary and beyond it to deem ourselves as competent as the Board to pass upon issues of fact. * * *

Upon the second issue we had said that we could find no practicable mesne between giving the findings of an examiner the immunity which a court must give to those of a master, and saying that, although the Board should no doubt treat them as having some evidentiary value, it was impossible for us to measure what that ought to be; and that therefore we would decide the appeal, as though there had been no findings. Although this went too far, again it is plain that the weight which we should insist that the Board should give them must be left at large; except that we must count them for something, and particularly when—as indeed we said at length in our first opinion—they were based on that part of the evidence which the printed words do not preserve. *Often that is the most telling part, for on the issue of veracity the bearing and delivery of a witness will usually be the dominating factors, when the words alone leave any rational choice.* Perhaps as good a way as any to state the change effected by the amendment is to say that we are not to be reluctant to insist that an exam-

---

4. Two possibilities suggested by the Trial Examiner's opinion are that Mathis, having revealed his lack of a driver's license might have been allowed to procure the license or to take another position with the respondent.

iner's findings on veracity must not be overruled without a very substantial preponderance in the testimony as recorded." [Emphasis added]

The Board has shown no reason for disregarding the Trial Examiner's credibility findings. Without at least substantial countervailing evidence (National Labor Relations Board v. Dal-Tex Optical Co., 5 Cir. 1963, 325 F.2d 78), the Trial Examiner's credibility determinations may not be disregarded by the Board. Universal Camera Corp., v. NLRB, supra, NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829; Bon-R Reproductions, Inc., v. NLRB, 2 Cir. 1962, 309 F.2d 898; Pittsburgh-Des Moines Steel Co. v. NLRB, 9 Cir. 1960, 284 F.2d 74.

Accepting those credibility findings, no substantial evidence on the record as a whole supports any conclusion other than that Mathis' departure from respondent was unilateral, voluntary, and for reasons wholly unconnected with the prior discrimination.

The alternative contention of the general counsel, and the one relied upon more heavily at oral argument is that a discriminatee who obtains interim employment with the discriminating employer may leave that employment at any time and for any reason without affecting the backpay liability of the discriminator. Thus it did not matter that Mathis' departure was willful and unrelated to the discrimination.

In order to make this argument, the general counsel must distinguish the cases which hold that a discharged discriminatee who obtains interim employment with a stranger may not unjustifiably leave that employment without tolling the discriminator's backpay liability to the extent of the wages earned from the stranger. E. g. NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 575.

The ground for such a distinction is said by the general counsel to be discernible from a reading of Phelps Dodge Corp., v. NLRB, 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271. The general counsel invokes the portion of *Phelps Dodge* which says that "the central purpose of the act [is] * * * directed * * * toward the achievement and maintenance of workers' self-organization." 313 U.S. at 193, 61 S.Ct. at 852, 85 L.Ed. at 1282. But, as the general counsel also realizes, *Phelps Dodge* explains the policy behind back pay orders as "not so much the minimization of damages as the healthy policy of promoting production and employment." 313 U.S. at 200, 61 S.Ct. at 855, 85 L.Ed. at 1286. We have stated: "The employee's duty [to seek interim employment] is based both on the doctrine of mitigation of damages and on the policy of promoting production and employment." NLRB v. Miami Coca-Cola Bottling Co., supra, 360 F.2d at 575. We understand and approve of the cases holding that a discriminatee's refusal to accept re-employment which is less than reinstatement may not constitute willful loss. E. g., NLRB v. Armour & Co., 10 Cir. 1945, 154 F.2d 570, 169 A.L.R. 421, cert. denied, 1946, 329 U.S. 732, 67 S.Ct. 92, 91 L.Ed. 633; NLRB v. Poultrymen's Service Corp., 3 Cir. 1943, 138 F.2d 204. We cannot, however, hold that it is no willful loss for a discriminatee who has accepted interim employment with the discriminator to leave that employment for a reason unconnected with the discrimination. Where a discriminatee takes an interim job with the discriminator, his quitting for reasons unconnected with the discrimination tolls the discriminator's backpay obligation to the extent of the interim wage; this is the same result as if the discriminatee had unjustifiably quit a similar job with a third party. In neither case does the employee have the unlimited option to leave an interim job without incurring a willful loss. The spirit and specifics of *Phelps Dodge* and the Act are fulfilled rather than frustrated by encouraging re-employment of

illegally discharged employees and discouraging such employees from leaving those jobs for reasons unconnected with the discrimination. The interim employment offered by the discriminator may itself be intended as a further instrument of discrimination, but it may instead be a step toward the proper end of undoing the discrimination, taken while the discriminatee pursues his ultimate goal of reinstatement. There is no final absolution or redemption from the original sin of violating the Act until reinstatment, but temporary interim employment with the discriminator does not counter the spirit of the Act. Even if the interim employment does not meet the norm of reinstatement it may still be a step on the path of penance. A truce may not be a peace, but it is not a war. A discriminatee should not be able to leave such interim employment for any reason which comes into his head and yet be assured, as the Board would assure him, that he will not thereby incur any financial loss. The discriminator must not be liable for the discriminatee's losses when those losses have not been caused by the discriminator. To hold otherwise would be to render the backpay obligation punitive and to discourage production and employment.

In the present case the truck driver's position was not reinstatement, but it was a far less odious job than that of cook's helper, and Mathis' objections to it were mild, if they existed. Mathis quit the job for no reason relevant to the prior discrimination. The general counsel did not claim, nor do we think he could successfully claim, that if Mathis had taken an identical truck driver's job with a third party and had left that job for reasons identical with those here, that departure would not have amounted to a willful loss. We see no reason to call it anything but a willful loss in the present case. We enforce the Board's backpay order only to the extent of the amount computed by the Trial Examiner.

Enforced as modified.