**BANDAG, INCORPORATED, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 76–2755.

United States Court of Appeals, Fifth Circuit.

Nov. 9, 1978.

Charles Clark, Circuit Judge, concurred in part and dissented in part and filed opinion.

Joseph P. Parker, Fort Worth, Tex., for petitioner, cross-respondent.

John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Paul J. Spielberg, Asst. Gen. Counsel, Christine W. Peterson, Atty., Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for respondent, cross-petitioner.

George Kaufmann, Ruth Weyand, Washington, D. C., for Local 1016, affiliated with Int. Union of Elec., Radio, etc.

Before WISDOM, GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

The employer has filed a petition to review Board orders and the Board has cross-petitioned for enforcement.

In an election, held January 23–24, 1975, at the company's plant in Abilene, Texas,[1] 15 votes were cast for the union and 28 against. Before the election, by December 19, the union had a card majority, 27 out of a unit of 48 employees. The union filed objections to the election, the Regional Director made an investigation and filed a complaint, and the ALJ conducted a hearing. He found that in a period immediately preceding the election the company had interrogated employees concerning their union sentiments, threatened employees with reprisals for engaging in union activities,

1. The plant produces tire tread for auto and truck tires.

promised benefits for voting against the union, and maintained unlawful no-solicitation and no-distribution rules. He also found that soon after the election and because of their union activities the company had discharged Carlos Rodriguez, the union's prime in-house organizer, and had suspended for three days union committeeman Scott Hayes.

The ALJ recommended a cease-and-desist order with respect to the 8(a)(1) violations and reinstatement and back pay for Rodriguez and Hayes. He also recommended a *Gissel* [2] order requiring the company to recognize and bargain with the union.

The Board entered an order adopting the ALJ's findings and recommendations on the 8(a)(1) violations and the discharges. By a 3–2 vote, and relying on *Irving Air Chute Co., Inc.,* 149 N.L.R.B. 627 (1964), the Board declined to adopt the recommendation for a bargaining order, and it certified the results of the election, with the result that the union was not the bargaining agent. The Board held that it could not enter a bargaining order because the union had withdrawn its objections and there was not before the Board any meritorious objection to the election. The two dissenters urged that the pendency of a meritorious objection was not prerequisite to a bargaining order.

The General Counsel moved for reconsideration, and the Board entered a supplemental order in which it found that there had been a meritorious objection pending which was the predicate for a bargaining order, and it adopted in toto the remedial order originally recommended by the ALJ.

## I. The 8(a)(1) violations.

■ We need not discuss the findings of many instances of coercive interrogation, threats of reprisals, and promises of benefits. They are described at more length in the ALJ's order, quoted in part III below. The employer does not even contest many of them, recognizing that they rest on credibility choices. The Board also found a "multitude" of other acts displaying anti-union animus of the company and its supervisors (including distribution of improper preelection literature) which, though not alleged as independent violations, were relevant in assessing the violations that were alleged. The evidence supports these findings also.

■ Until November 15, 1974, the company had a no-solicitation rule published in its employee handbook forbidding:

> Circulating petitions, distributing any written or printed matter, or posting same such matter of any description on Company premises, including parking lots, without prior approval of Plant Manager.

The company admits that this rule was overbroad because it did not distinguish between working and nonworking time. *See Mason & Hanger-Silas Mason, Inc., v. NLRB,* 405 F.2d 1, 4 (CA5, 1968); *NLRB v. Walton Manufacturing Co.,* 289 F.2d 177, 180–81 (CA5, 1961). The rule was presumptively invalid, and the company has not advanced any compelling business justification that might make it valid. *See Walton Manufacturing Co., supra.*

■ Effective November 15 the company adopted a new rule forbidding:

> Circulating petitions, distributing any written or printed matter, soliciting, or posting same such matter of any description during working time in plant without prior approval of Plant Manager.

This limited the previous proscription to "in plant" and "during working time," but it broadened the old rule to include "soliciting." The Board acknowledges that the new rule is facially valid, but its orders require the company to cease and desist from maintaining or giving effect to it. The Board relies upon cases holding that discontinuance of an unfair practice is not a defense where other unfair practices indicate that the coercive effect of discontinued conduct has not been dissipated. The company insists that it committed no unfair practice with respect to solicitation rules because the old rule, though too broad, was

2. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

never enforced. The evidence reveals that no one paid much attention to the old rule. But the mere existence of such a rule may violate the Act because of the possibility that it may chill the exercise of rights guaranteed by § 7. *Utrad Corp. v. NLRB,* 454 F.2d 520, 523–24 (CA7, 1971); *see Walton Manufacturing Co., supra.* Accepting *arguendo* the Board's theory that despite its moribund nature the old rule still might have a chilling effect, we nevertheless decline to enforce the part of the order forbidding maintenance or enforcement of the new rule.

Witnesses described in-plant solicitations carried on during the organizational campaign, such as United Fund, solicitation for a Christmas present for a supervisor, sale of oranges for the Future Farmers of America, and an informal 25¢ football pool participated in by numerous persons (including plant manager McGlothin). McGlothin described these solicitations as morale builders, participated in by all, and done with his advance permission.[3] The Board found that nonunion solicitations such as these continued after adoption of the new rule. In explaining the new rule to employees, McGlothin said this:

> Look, this is for the protection of not only you, but the company too. . . . It's for both our benefits. . . . The main reason for it is I'm not going to tolerate people circumventing rules and situations just to gain favor for something they want, when it's not something the company wants. We're just not going to tolerate it. That's all there is to it.
>
> . . .
>
> This does not mean you can't talk on the job. . . . As long as you keep up your job pace and the quality level of your job and work at it safely without your attention on something else, and not, you know, disrupting or anything—work or anything, fine. That's exactly what the rule means. If you want to sell something here, if you want to sell a car or something; if you want to put it on the bulletin board, give it to me and I'll let you put it on the bulletin board.

Elsewhere in his speech he pointed out that the company would not put up with badgering employees, cursing them, threatening them and disruption of work.

The Board drew the inference that there was a company design to deny advance approval, and to prevent, union solicitations, while permitting nonunion work interruptions, which kept alive the presumptive chilling effect of the old rule. These inferences are not supported by substantial evidence. There was no evidence that either of the rules had been selectively applied or enforced. The new rule constricted the geographical and temporal scope of the former rule to in-plant work time. It broadened the scope of activities governed by bringing in solicitation. Nonunion solicitations had been approved, but the union had never asked permission to solicit. When McGlothin described the new rule to an employees' meeting he spoke of the rule's being circumvented, and he made clear that the company would insist that it be obeyed. He neither said nor implied that the union, if it asked permission to engage in activities for which permission was required, would be turned down. McGlothin's discussion of talking on the job related to "solicitation," but what he said was less restrictive than the new rule itself.[4]

## II. The discharges.

We consider the discharge of Rodriguez and the three-day suspension of Hayes.[5]

---

3. Arguably these were not within the old rule at all, since it did not mention "solicitation."

4. Elsewhere in its findings the Board noted that under the uncontradicted evidence employees frequently spoke to each other on nonwork-related matters during working hours. The record contains numerous instances of in-plant discussion of union activities and of the organizational campaign.

5. The Board found that the suspension of another employee, Hill, was not discriminatory, because his remark concerning the danger of persons having sugar put in their gas tanks was unprotected activity.

When all the facts are laid out, the discharge of Rodriguez is seen to be a garden-variety mixed-motive firing. Rodriguez had been a leading in-house organizer for another union in an unsuccessful campaign at the same plant in 1972, and these activities had been known to the company. In the fall of 1974 he became the leader of the second organizational effort. He wore a special union button identifying him as a member of the organizing committee. Rodriguez, like other employees in the small plant, enjoyed an open and friendly relationship with manager McGlothin. Before the election Rodriguez discussed the campaign with McGlothin, who told him, "This time it was going to be different because this time he [Rodriguez] was going to get in trouble."

Rodriguez told McGlothin that he had applied for a job with another employer in the same city, and the manager threatened to tell the other employer that Rodriguez was a troublemaker, and he told Rodriguez that he would not be able to get a job anywhere in the city. Later McGlothin accused Rodriguez of spreading a false rumor that McGlothin was in favor of the union, and he warned Rodriguez that if the rumor didn't stop Rodriguez would have to get an attorney to defend himself. McGlothin acknowledged that he was trying to frighten Rodriguez. In the same conversation Rodriguez told McGlothin that he had gotten into the campaign reluctantly but would "take it all the way this time." The election took place January 23–24. On one of these days a supervisor told Rodriguez the company had "plenty of money to fire him."

On February 5 the crew operating the machine to which Rodriguez was assigned was shorthanded, and Rodriguez was given additional duties to perform. A dispute arose between him and his foreman. The company took the position that Rodriguez refused to obey orders of the foreman, while Rodriguez insisted that he had merely suggested an alternate work procedure which would benefit everyone. Rodriguez is illiterate. His native language is a Spanish dialect spoken in the Southwest. He speaks and understands English but not very well. The foreman testified that Rodriguez directly refused an order to assist with heavy unloading work. On credibility grounds the Board rejected this as part of "a contrived script."[6] The Board found that the foreman had seized upon an opportunity to treat as insubordinate poorly expressed suggestions from Rodriguez and a justified inquiry from Rodriguez concerning being assigned two jobs at once on the machine. Substantial evidence justified the Board's conclusion that the asserted reason for Rodriguez's discharge was pretextual. The conclusion is nailed tighter by the justified findings concerning the company's antiunion animus and other antiunion actions. The provision of the order requiring that Rodriguez be reinstated with back pay must be enforced.

The three-day suspension of Hayes is a closer question. He was a member of the organizing committee. In a brief, informal discussion during break, Hayes asked employee Gray to sign a union card, and Gray demurred saying he wanted to find out both sides of the question before committing himself. In the ensuing conversation Hayes described a scab as "a low life mother fucking son of a bitch." Later Gray asked a supervisor, what he thought of someone calling him a "skag." Gray was not familiar with the word "scab" until he talked to the supervisor. Gray related Hayes' definition of scab, and the supervisor reported the story to McGlothin. McGlothin called in Hayes and asked him if he had *called* Gray a scab. Hayes admitted his obscene definition of the term, but he denied *calling* Gray a scab. McGlothin related to Hayes his own definition of scab: "A person who has the courage of his convictions to cross a picket line and go to work and earn money for his family."

---

**6.** Rodriguez's previous foreman testified that in the two years Rodriguez had worked for him, he never refused an order, including orders to assist with the same kind of work as the extra work he was told to do in this instance.

McGlothin told Hayes he was suspended for three days for three reasons—for badgering Gray, for calling Gray a scab, and for defining scab as he did. The record does not support that Hayes "badgered" Gray. In Gray's version of the brief one-time dialogue there is no description of undue pressure. In his testimony Gray did not say that Hayes *called* him a scab but rather that Hayes asked "if I knew what a scab was." As the Board recognized, the story had grown in the re-telling. What began as an obscene reference in the third person expanded to McGlothin's ultimate understanding that both the term scab and Hayes' definition of it had been directed at Gray himself. Thus, of the three grounds given for Hayes' suspension two related to the organizational campaign—badgering Gray and calling him a scab—and both were erroneous. The third ground was the use of the obscene definition. Uniformly, the testimony was that language of the nature used by Hayes was not uncommon in the plant. The Board found, and we cannot disagree, that McGlothin was not acting to clean up Hayes' language but to counter his "hard-sell" approach to union organization. We thus conclude that the order of reinstatement and back pay for Hayes must be enforced.

### III. The bargaining order.

■ The company contends that, as found by the Board in the original order, there was no meritorious objection before the Board to support a bargaining order. The union-filed objections on January 31 consisted of five specific and numbered points concerning written materials distributed by the company and allegedly containing false statements. Copies of the materials were attached. The specific objections were preceded by this statement:

The above named employer through his plant manager, supervisors, and other nonbargaining unit employees engaged in improper conduct and or unfair labor practices as defined in Section 8(a) 1 of

the Act. In so doing, the Employer destroyed the laboratory conditions affording a free choice.

This was followed by the five enumerated objections, and after them was this statement:

By the above and other acts, the above-named Employer has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act.

The Regional Director commenced an investigation which turned up information tending to show that there had been pre-election threats and promises made to influence the outcome of the election, all extrinsic to the contents of the literature described in the five specific objections. On March 19 the Regional Director approved the union's withdrawal of the five numbered objections and ordered a hearing on additional misconduct he had discovered during his investigation. The Board's supplemental order pointed to the catch-all objection, which had not been withdrawn, and found that the union had not renounced its interest in disputing the results of the election. We agree that the viable general objection supported the Regional Director's inquiry into matters beyond the scope of the numbered and withdrawn objections so that, under *Irving Air Chute,* as construed by the majority, the Board could consider and rule on the validity of the election.[7] *NLRB v. Allis-Chalmers Corp.,* 563 F.2d 674, 676 (CA5, 1977).

■ In *NLRB v. American Cable Systems, Inc.,* 414 F.2d 661 (CA5, 1969), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970) (*American Cable I*), we discussed in detail the circumstances under which the Board may appropriately issue a *Gissel* bargaining order. We stated:

Under the *Gissel* holding a bargaining order may issue where: (a) the union had valid authorization cards from a majority of the employees in an appropriate bar-

---

**7.** Thus it is not necessary that we decide the dispute between the majority and the dissenters over whether a pending meritorious objec-

tion is essential to the Board's ruling on the validity of an election.

gaining unit; (b) the employer's unfair labor practices, although not "outrageous" and "pervasive" enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight"; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

*Id.* at 668–69. We find that in the instant case the Board has made such findings and that they are supported by substantial evidence. *See NLRB v. Orlando Paper Co.,* 480 F.2d 1200, 1202 (CA5, 1973); *NLRB v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 385 (CA5, 1973).

The first two requirements of *American Cable I* are clearly met here. Before the election, by December 19, the union had a card majority, 27 cards in a unit of 48 employees. Most of them had been signed during October and November 1974. Moreover, the anti-union activities found by the ALJ, and supported by the evidence were serious. They included threats to curtail plant expansion and to close the plant, a threat (carried out) to discharge the union's leader and to blacklist him in the community, threats to reduce benefits if the union won and promise to grant a wage increase if it lost, maintenance of an invalid no-solicitation rule, suspension of a member of the organizing committee, and repeated employee interrogation. We have not discussed these § 8(a)(1)'s at length because most of them are not even contested by the company in this court. These numerous violations, tending to dissipate the union's card majority, cannot be trivialized on the ground that the union did not specifically plead them when it objected to the election.

The evidence is in the record regardless of what brought it to the surface. The company's violations here are similar to, and no less serious than, those found sufficient to justify *Gissel* orders in *NLRB v. WKRG–TV, Inc.,* 470 F.2d 1302 (CA5, 1973), and *NLRB v. Kaiser Agricultural Chemicals, supra.* We pointed out in *Kaiser:*

> At the outset, we note that the board has broad powers in fashioning a remedy under section 10(c) to effectuate the policy of the Act. 29 U.S.C. § 160(c). The close relationship between labor policy and choice of remedy, coupled with the board's competence and expertise in the field of labor relations, dictate that the board's judgment be given "special respect by reviewing courts." *NLRB v. Gissel Packing Co., supra,* 395 U.S. 575, at 612, 89 S.Ct. 1918, 23 L.Ed.2d 547. Our task is not to make a de novo determination of the facts. *Fibreboard Paper Products Corp. v. NLRB,* 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233. Rather, the board's order must be upheld unless it can be shown that the board either abused its discretion or exceeded its statutory authority.

473 F.2d at 381–82 (footnotes omitted).

These thoughts on the appropriate standard of review are also relevant to our consideration of parts (c) and (d) of the four-part *American Cable I* test, regarding the unlikelihood of a fair election and the protection of employee sentiment. The Board addressed those issues in adopting the ALJ's findings,[8] and these findings are supported by substantial evidence indicative of an extensive investigation and evaluation of conditions in the shop.

Judge Clark's disagreement with the Board's conclusion that a bargaining order is appropriate rests primarily on the ground

**8.** The language of the ALJ's findings relating to these issues was that "conduct by the Respondent makes it highly unlikely that a rerun election can be utilized in the foreseeable future as an accurate indicator of employee sentiment." App. at 236. While not precisely echoing our language in *American Cable I,* it does address both issues, the unlikelihood of a fair election and the protection of employee sentiment. The exact language used is unimportant, moreover, as long as the findings were based on substantial evidence regarding both issues. What we require of the Board is an investigation of these issues, not "a litany, reciting conclusions by rote." *NLRB v. American Cable Systems, Inc.,* 427 F.2d 446, 449 (CA5, 1970) (*American Cable II*).

that the Board should have considered evidence of employee turnover in the period of time between the unfair labor practices and the Board's order. While events subsequent to an unfair labor practice are normally not considered in our review of a Board order, *NLRB v. Katz*, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114 n. 16, 8 L.Ed.2d 230, 239 n. 16 (1962), we have held that because of the unusual nature of a *Gissel* bargaining order the Board should look to subsequent events to determine the appropriateness of the order. *American Cable II*, 427 F.2d at 448; *J. P. Stevens & Co. v. NLRB*, 441 F.2d 514, 525 (CA5, 1971).

This case, however, presents a narrower question, since the Board did not stop its inquiry at the time of the unfair labor practices. Here the only possible error is that the Board failed to accept evidence of employee turnover in the period between the hearings and findings of the ALJ and that of its own review.[9] While the Board is free to reopen the record of a case, its normal procedure is to review the record of the ALJ's proceeding much as an appellate court reviews a trial court proceeding.[10] This court should be cautious in considering whether to impose upon the Board a requirement that would so seriously interfere with its established procedures.[11]

While there may be situations in which the Board would be compelled to reopen a record in order to proceed fairly, we cannot say on the facts before us that this is such a case. Here there was adequate evidence

for the Board to find that a fair election could not be held at the plant regardless of employee turnover since the time of hearing. The Board's experience and expertise put it in a better position than we to evaluate the seriousness of the unfair practices and their impact on the plant. Practices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed. The Board is not compelled to infer that past practices have attenuated, especially practices striking directly at the heart of the security of the employees, such as threats to close the plant, blacklisting, and the like. Employee turnover between unfair labor practices and bargaining order is a relevant consideration for the Board in such a case. *See NLRB v. Gibson Products Co.*, 494 F.2d 762 (CA5, 1974); *J. P. Stevens & Co. v. NLRB, supra.* In this case, however, the Board could find that regardless of turnover the taint of the practices would continue. We cannot say, therefore, that the Board erred in adopting the ALJ's findings and conclusions without reopening the record.

It might be argued that while the Board was justified in making finding (c) as required by *American Cable I*, it could not reasonably have made finding (d), that "employee sentiment can best be protected in the particular case by a bargaining order," without considering the proffered evidence of employee turnover. In considering this issue we must first determine precisely

9. The instant case is thereby distinguished from *American Cable II*. In that case we held that when we remand a case involving a *Gissel* order to the Board because of inadequate findings the first time, it must consider all available evidence on remand. That is, the appropriateness of a *Gissel* order was to be decided as of the time when the Board made adequate findings and entered a proper order rather than as of an earlier time when it made an inadequate and abortive order. These considerations are not present in this case.

10. *See* NLRB Statements of Procedure—Series 8, § 102.48. We have recognized the propriety of Board deference to the findings of an ALJ, and indeed have insisted that it give weight to his credibility determinations. *NLRB v. Aycock*, 377 F.2d 81, 87 (CA5, 1967).

11. This consideration is underscored by the Supreme Court's recent reaffirmation of the general principle that courts of appeal should not interfere with agency procedure. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). While *Vermont Yankee* involves another agency, its rationale was applied in a very similar situation in *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55, 84 L.C. ¶ 10,766 (CA3, 1978). There the Third Circuit reversed its earlier ruling that in issuing a *Gissel* bargaining order the Board must make its own statement of findings rather than relying upon those of an ALJ.

what finding the Board is required to make by this language in *American Cable I.* According to one plausible reading, it requires the Board to determine that the actual present sentiment of the majority of the work force favors the union. If this were the required finding, evidence of substantial turnover in the time since the existence of a card majority would be critical evidence that could not be ignored. This is essentially the reasoning of Judge Clark in dissent.

We believe, however, that *American Cable I* does not place so heavy a burden on the Board. If the Board were required to determine present majority sentiment in each case, an election would almost always be the appropriate remedy. This would ignore the teaching of *Gissel.* A better reading of part (d) of the four-part *American Cable I* test can be gleaned from the passage of *Gissel* quoted just prior to the statement of that test:

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that *employee sentiment once expressed through cards*, would on balance, be better protected by a bargaining order, then such an order should issue . . .

414 F.2d at 668, quoting 395 U.S. at 614–15, 89 S.Ct. at 1940, 23 L.Ed.2d at 578 (emphasis added).

The fourth finding required of the Board by *American Cable I* is, then, that employee sentiment can best be protected in the long run by issuing a bargaining order. Many factors are relevant to such a determination, including past union activity, employer responses to such activity, and expressions of employee sentiment such as the signing of union cards. While substantial employee turnover is relevant to this inquiry, we cannot say that it is so crucial that the Board erred by following its usual practice of adopting the ALJ's findings without reopening the record.

In enforcing this order we are not encouraging the Board to use bargaining orders as a punishment for employer misconduct. Such orders are always remedial and are designed simply to set matters as they would have been in the absence of employer misconduct. The Supreme Court held in *Gissel* that at times the best such remedy is to order bargaining with the union that had a majority and to let it " 'function for a reasonable period in which it can be given a fair chance to succeed.' " If Bandag's new employees are dissatisfied with the union, they will be free later to seek a decertification election.

Except with respect to the new distribution and solicitation rule, the Board order must be enforced.

Enforcement is GRANTED in part, DENIED in part.

CHARLES CLARK, Circuit Judge, concurring in part and dissenting in part:

I concur with part I of the majority opinion and I concur in the result reached in part II. I respectfully dissent, however, from that portion of part III of the majority opinion which affirms the Board's conclusion that a *Gissel* bargaining order is necessary in this case. I do not agree that we can imply a Board finding that employee sentiment can best be protected in this particular case by a bargaining order. Yet this finding is one of the four that must be made to determine that a bargaining order is appropriate. *NLRB v. American Cable Systems, Inc.,* 414 F.2d 661, 668–69 (5th Cir. 1969) (*American Cable I*).

After enumerating the § 8(a)(1) violations found, the ALJ concluded:

> Such conduct by the Respondent makes it highly unlikely that a rerun election can be utilized in the foreseeable future as an accurate indicator of employee sentiment. By this conduct the Respondent has forfeited a right which it might otherwise have to insist that the question concerning representation herein be resolved by use of ballots rather than designation cards.

This determination was affirmed by the Board, which states only the following with

respect to the appropriateness of the bargaining order:

> We also find, in agreement with the Administrative Law Judge, that the 8(a)(1) and (3) violations herein called for a remedial bargaining order.
>
> . . . [I]n cases such as this, where the respondent has committed violations of Section 8(a)(1) and (3) which preclude the holding of a fair rerun election, we will issue a remedial bargaining order.

Although it is clear that the ALJ felt a bargaining order appropriate since the company had forfeited its right to demand an election, and although the ALJ and Board felt it unlikely that a fair rerun election could be held, there is nothing to show that either the ALJ or the Board gave any consideration to the sentiments of the present work force.

I don't see how this appellate court could imply that the Board must have concluded that employee sentiment could best be protected in this particular case by a bargaining order. At the time the bargaining order issued, only 15 of the company's then 43 employees had been with the company in January 1975. This means that 28 employees were then new to the time of the unfair labor practices found and the solicitation of cards. The Board, however, refused to consider this evidence. In its Supplemental Decision and Order issuing the bargaining order, the Board justified this refusal as follows:

> Following the hearing [before the ALJ] in this case, Respondent filed a motion to reopen the record in order that the Board consider evidence of employee turnover since the election and its effect on the efficacy of issuing a bargaining order in lieu of directing a second election. In view of our disposition of the case in the previously issued decision, we denied the motion because the evidence sought to be admitted was irrelevant. In view of our disposition of the proceeding in this Supplemental Decision, Respondent's motion is denied as lacking in merit. It is well settled that the Board is not precluded from issuing a bargaining order even

though time has passed and a substantial turnover of personnel has occurred since the commission of the unfair labor practices. *N. L. R. B. v. Benne Katz d/b/a Williamsburg Steel Products Co.*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); New Alaska Development Corp., Alaska Housing Corporation, 180 NLRB 971 (1970).

The relevant time-period for determining whether a bargaining order is required is when the matter is before the Board for remedial action. Although it is inappropriate for this court to consider changes occurring after the date of the Board's order, the Board should consider the current situation in the plant at the time it issues a bargaining order. *J. P. Stevens & Co. v. N. L. R. B.*, 441 F.2d 514, 524–25 & n.16 (5th Cir. 1971). *See N. L. R. B. v. Gibson Products Co.*, 494 F.2d 762 (5th Cir. 1974); *N. L. R. B. v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir. 1970) (*American Cable II*). If conditions at the plant at the time of the Board proceedings are such that employee sentiment can be expressed in an election, the Board should not enter a bargaining order. *J. P. Stevens & Co. v. N. L. R. B.*, *supra*. The majority cautions noninterference with the Board's practice of accepting without further investigation the ALJ's findings, likening our role there to review of trial proceedings. However, it seems to me that the Board's responsibility to view the situation existing at the time of its order makes the analogy inappropriate. While apropos to the proposition that the ALJ's findings regarding witness credibility should stand, I cannot accept its application to factual findings which may have changed prior to the relevant time of inquiry.

I respectfully disagree with the majority's statement that the Board extensively investigated and evaluated the conditions in the shop at the time the order was under consideration. As I read the record, it appears that the Board, without any objective evidence before it, simply concluded *ipse dixit* that the sentiment of this work force, the overwhelming majority of which have never been exposed to any proven unfair

labor practice, could best be protected by a bargaining order. The bottom-line reason for this conclusion is revealed in the ALJ's order: the company has "forfeited" its right to demand an election because of its prior misdeeds. By focusing on protecting employee sentiment "in the long run" rather than at the time of the Board's order, the majority accepts that rationale. Such use of a bargaining order to punish an offending company has been rejected by our cases; the only legitimate occasion to use such a remedy is when its therapeutic value is necessary because the electoral atmosphere continues to be contaminated and its use would best protect the sentiment of the work force. *N. L. R. B. v. Gibson Products Co.*, 494 F.2d at 770; *American Cable II*, 427 F.2d at 448.

Bargaining orders are not traditional remedies. The Board's increasing resort to this extraordinary procedure is disquieting. In what is an obvious effort to punish Bandag for its past violations by making it bargain with the offended union, the Board has ignored the interests of employees who would be forced into accepting this bargaining agent whether they like it or not. This court has recently recognized that "it is indisputable that the thrust of the NLRA is not the protection of the union, not the protection of the employer, but rather the protection of the employee." *Mosher Steel Co. v. N. L. R. B.*, 568 F.2d 436, 442 (5th Cir. 1978). *Gissell* was designed to protect employee sentiment which may have become overborne by an employer's past anti-union activities. But where, as here, it is not clear whether at the time of the Board's order such practices clouded that sentiment or whether natural attrition itself was responsible for a legitimate change in sentiment, a bargaining order no longer serves that purpose, I say only that it is the Board's responsibility to make that determination. To carry out that responsibility, it need not in every case require an election as the majority asserts.

*American Cable I* teaches that it is inappropriate for this court to make a finding on the question of whether the sentiment of these 28 employees would best be protected by a bargaining order. None of these 28 had ever signed cards, and none of them was in the plant when the practices found to forfeit the company's right to protest a bargaining order took place. In the absence of any specific finding as to their views or the impact, if any, of past practices on their present ability to protect themselves in another election, this court should not imply that past practices live on in the lore of the shop and thus require a bargaining order for their protection.

If the interests of the present employees in this case, who are being forced into collective bargaining with an unchosen union as their representative, are not to be jeopardized, we should remand so that the Board may determine whether it can make the necessary finding on protection of employee sentiment, just as was done in *American Cable I*.