Gendra SENNELLO, Plaintiff,

v.

RESERVE LIFE INSURANCE
CO., Defendant.

No. 84–1209–Civ.

United States District Court,
S.D. Florida.

Aug. 24, 1987.

**1500**

Elizabeth J. DuFresne, Steel Hector & Davis, Miami, Fla., for plaintiff.

William E. Sizemore, Thompson, Sizemore & Gonzalez, Tampa, Fla., for defendant.

## ORDER, FINDINGS OF FACT, CONCLUSIONS OF LAW

MARCUS, District Judge.

This action was brought by Plaintiff Gendra Sennello, a woman formerly employed by Defendant Reserve Life Insurance Company, alleging violations of Title VII of the Civil Rights Act of 1969, as amended, 42 U.S.C. Section 2000e, *et seq.* Ms. Sennello's complaint was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. The Plaintiff, Gendra Sennello, was employed by Defendant Reserve Life Insurance Company ("Reserve Life") from August 1972 until January 10, 1980. She held a variety of positions with Reserve Life, including district manager of the district office known as Ft. Lauderdale # 1, until November 15, 1979, when she was demoted by Defendant to sales agent, which position she held until January 10, 1980, when she was terminated by Defendant.

2. At all times relevant to this cause of action, Reserve Life has been a corporation engaged in the health and life insurance business. Defendant has operated in Florida since prior to 1972 and is headquartered in Dallas, Texas. It employs more than fifteen employees.

3. At all times relevant to this proceeding, Reserve Life's marketing programs were formulated in its home office in Dallas. Its sales efforts were managed on a geographical basis. Some of the Company's regions were state-wide in scope, while others were multi-state in nature. The Defendant corporation was headed by a president, and serving immediately under him were a national vice president for marketing and regional vice presidents for marketing. Each region generally was supervised by a regional manager, and each region was further subdivided into marketing agencies, which, in turn, were divided into districts. The selling efforts in each district were supervised by a district manager.

In Florida, the state-wide region was managed by a regional manager. Subordinate to the regional office were a number of agencies, each of which was managed by an agency manager. The agency primarily involved in this case was the Ft. Lauderdale agency; and beneath that agency were a number of district offices. Prior to 1978, the district offices were further subdivided into branch offices, supervised by branch managers. By the end of 1978 approximately, Reserve Life terminated its branch offices and the district office became the lowest level of management organization.

4. Douglas Pierce was, from approximately May 1978 until March 1984, the President of Reserve Life, and maintained his office in Dallas, Texas.

5. Jerry Edgin was employed by Reserve Life as its National Sales Vice President in 1978 and 1979, and was responsible for its marketing efforts.

6. John Crooks was for many years Regional Manager of the Florida Region of Reserve Life, until his termination from the Company in May 1979. The Florida Region was also known as the Southeast Region.

7. William Ebert was for many years prior to 1979 employed by Reserve Life as regional manager of various regional offices throughout the country. In August 1979, Ebert was assigned to the position of regional manager in Florida. Ebert resigned from Reserve Life in 1986.

8. William Leahan served as the agency director for Reserve Life's Ft. Lauderdale agency office for many years. He was terminated by Reserve Life in December 1979.

9. Roger Silversmith was employed by Reserve Life as a district manager. On November 15, 1979 he was demoted from the position of district manager of the "Hollywood" district. In February 1980, Silversmith was terminated by Reserve Life.

10. Michael Schiff was, in November 1979, employed by Reserve Life as district manager of the district office known as Ft. Lauderdale # 3. On November 15, 1979, Schiff continued to serve as district manager, but changed his location to the Ft. Lauderdale # 1 office, as the Ft. Lauderdale # 3 district office (then managed by Plaintiff) and the Hollywood office (then managed by district manager Silversmith) were consolidated into a single district.

11. Plaintiff Sennello moved to southeast Florida from Michigan, and in the fall of 1972 she secured a position as sales agent with Reserve Life in the branch agency that later became the Ft. Lauderdale agency. By April 1973, Plaintiff was promoted to a management position, becoming branch manager, and in September 1973 she was again promoted to the position of district manager. Between September 1973 and late 1977–early 1978, Plaintiff, at the request of the Company, moved to a number of different locations as certain offices were restructured by Reserve Life. In early 1978, Plaintiff assumed the position of district manager of the Ft. Lauderdale # 1 district office. She held that position until November 15, 1979, when she was demoted by Defendant.

12. Management personnel at Reserve Life generally held two contracts, one as sales agent, and another as to the particular management position held. When Plaintiff was demoted as district manager in mid-November 1979, she continued as a sales agent, operating under her sales contract with Reserve Life. Soon thereafter, on January 10, 1980, Reserve Life cancelled Plaintiff's contract, thereby severing its relationship to Plaintiff.

13. On April 10, 1980, Sennello filed sex discrimination charges with the Broward County Human Relations Division and with the United States Equal Employment Opportunity Commission. On December 1, 1980, Plaintiff filed an amended charge with the EEOC. On February 16, 1984, the EEOC terminated its administrative process and issued to Plaintiff its "Notice of Right to Sue." The instant action was commenced on May 14, 1984.

14. Based upon the testimony and documentary evidence adduced at trial, we find in sum that Plaintiff's "resignation" as district manager in Ft. Lauderdale in November 1979 was coerced by the Defendant, Reserve Life, and that this constituted a substantial demotion. We also find that the decision to demote Plaintiff by forcing her to resign, and the concomitant decision to select Michael Schiff and not the Plaintiff to serve as district manager of a newly consolidated Reserve Life district office in Ft. Lauderdale, was in fact the result of gender-based discrimination. This record reveals both direct and circumstantial evidence of Defendant's discriminatory motive or purpose. It is clear to us that Plaintiff was a member of a protected class, that she was fully qualified for the job of district manager—indeed she was more qualified by her background and experience to be selected for the consolidated district manager's position than Mike Schiff—and that she was improperly forced to resign from her position as Ft. Lauderdale district manager. While we find that Reserve Life had valid and neutral business reasons justifying its decision to consolidate three Ft. Lauderdale offices into one, upon a fair review of this record, we are compelled to conclude that Plaintiff was not selected to manage that newly consolidated district as a result of pronounced gender-based discrimination.

15. In the Florida Region, the Regional Manager for many years had been John Crooks. He served in that position until his termination in May 1979. At trial Crooks testified that he had hired Plaintiff

sometime in 1972, and had observed her steady advancement in the company from branch manager to district manager. He indicated that Plaintiff's job performance had been very good, that she regularly qualified to participate at the Defendant's annual sales conventions, and indeed that she had been selected as the top life insurance salesperson for the Region. Crooks was terminated by Reserve Life's Sales Vice President, Jerry Edgin, in 1979 because the management of Reserve Life had concluded that the Region was foundering and was without effective leadership. Edgin and Reserve Life's President, Douglas Pierce, decided to transfer William Ebert to fill Crooks' position as Florida's Regional Manager.

16. The Ft. Lauderdale operations of Reserve Life experienced considerable operational difficulties in 1979. In substantial measure, this was the result of personnel changes, and in particular was a function of certain activities by Ft. Lauderdale Agency Director William Leahan who, while still employed by Defendant, assisted others in the formation of a separate insurance company which sold life insurance. There is no evidence, however, that Plaintiff Sennello encouraged Leahan or participated in any way in these activities.

17. William Leahan was employed by Reserve Life from approximately December 1966 until late 1967, and from February 1970 until December 1979. He held the position of Agency Director and directly supervised Plaintiff's work at Reserve Life for many years. Under his immediate direction, Plaintiff was promoted to the position of district manager. While it is true that Leahan was involved personally and socially with Plaintiff, we nevertheless credit his testimony as to Plaintiff's job performance. Leahan observed that Plaintiff was so able a manager that Reserve Life offered her the position of agency director in another region of the country; she rejected that offer as she did not wish to move out of state. Leahan also testified that Plaintiff performed well in the critical area of recruitment, that she enthusiastically and ably hired agents to work in her offices, and that no one had ever complained to him about Plaintiff's performance.

18. Leahan also testified—and we credit this testimony, too—that when William Ebert took over as Florida Regional Manager, Ebert met with him sometime in 1979 to discuss ways to increase production and manpower in each of Leahan's thirteen offices. Leahan recounted that during this conversation Ebert told him that "we can't have women in management because women are like Jews and Niggers; they hire like themselves, and the trouble with that is that when they leave they take them with them." Leahan further testified that Ebert was particularly critical of Plaintiff's performance as district manager because Plaintiff had hired too many women.

Leahan subsequently told Plaintiff that Ebert was unhappy with the "gender makeup" of her offices, and urged her to hire more men. Relations continued to decline, and Leahan recalled that on one occasion, he attended a meeting in a bar or lounge with Ebert and many of the sales force present, at which time Ebert would not acknowledge Plaintiff's presence.

19. Leahan also testified that in November 1979, Ebert instructed him to terminate Sennello immediately as district manager. Ebert indicated that if Leahan didn't terminate Plaintiff within twenty-four hours, Ebert would do it himself. Leahan explained that he tried to convince Ebert to allow Plaintiff some thirty days in which to correct any perceived problems, but Ebert insisted that the termination be effected at once. Accordingly, upon the instructions of his superiors, Leahan met with Plaintiff and urged her to resign as district manager instead of being fired. Leahan explained that she had not employed enough men in her offices. He added that Plaintiff could stay on as an agent and await further management developments. Sennello thereafter resigned her position as district manager on or about November 15, 1979, but indicated that she would stay on as an agent with Reserve Life. As we have noted already, we find that Plaintiff's resignation was "coerced" by Reserve Life.

20. Defendant Reserve Life has attacked Leahan's credibility, urging us to reject his testimony for two reasons: first, because Leahan was personally involved with Plaintiff; and second, because Leahan was fired by Reserve Life on account of his having created a new insurance business while remaining in the Defendant's employ, in violation of his contract. However, we found Leahan to be a credible witness. We note that his testimony was corroborated in substantial measure by the testimony of other witnesses and by much of the documentary evidence. Moreover, in the context of this record, his testimony makes more sense to us than the explanations offered by Defendant Reserve Life for Plaintiff's demotion and ultimate termination.

We observe again that virtually every witness who testified commented that Plaintiff was a very effective and productive manager for Reserve Life. Not only was that opinion presented by Messrs. Crooks and Leahan, but also by Bruce Robbins, Roger Silversmith and Carl Adams, Jr. Robbins, who was employed by Reserve Life from April 1976 until about April 1980, held a number of management positions with Defendant, including branch manager and district manager in the South Florida area. For a period, Robbins worked directly for Plaintiff, and then became her equal, also holding the title of district manager. Robbins opined that Plaintiff was an excellent district manager, and that she had effectively trained and highly motivated him. Indeed, Robbins offered the view that Plaintiff was a far more effective district manager than Mike Schiff. Finally, Robbins testified that no one at Reserve Life had ever discussed the gender make-up of his office with him, nor did anyone ever suggest that the company had any policy as to hiring a particular percentage of men or women as sales agents in each office.

Roger Silversmith, also a district manager at Reserve Life, and also demoted at the same time Plaintiff "resigned" as district manager, testified that as a manager, Plaintiff had effectively recruited sales agents and had had no difficulty working with or recruiting men. Carl Adams, Jr., still another employee with Defendant in Palm Beach, and an agency director since 1978, offered the view that Plaintiff was among the best agents and managers that he had encountered at Reserve Life.

Sennello's record at Reserve Life was indeed exemplary. She was promoted rapidly and often; she ultimately came to manage three offices effectively; she was highly regarded by her colleagues; and she was often recognized by Defendant Reserve Life for her accomplishments.

Moreover, we observe that *direct* evidence of gender-based discrimination is evident from the statements and testimony not only of Leahan but also from the testimony of Roger Silversmith and from the Plaintiff as well. Silversmith testified specifically that sometime in or about October or November 1979, he had a conversation about recruitment with Ebert, who had recently come into the Region. Silversmith offered Ebert his view that Plaintiff was a particularly able and skillful recruiter; Ebert responded that Plaintiff's problem was that "she has too many women, and we can't have that." Silversmith also testified that he saw no indication that Plaintiff favored women in recruitment or otherwise encountered any difficulty working with men. Silversmith, like Sennello, was demoted as district manager in November 1979. Nevertheless, we found his testimony to be credible.

Finally, Plaintiff's account of her demotion and termination is altogether consistent with the testimony of Leahan and Silversmith, and we credit her testimony too. More particularly, she testified that Leahan had told her that Ebert was dissatisfied with her performance in the area of recruitment because she employed too many women and not enough men. She recalled Leahan telling her that Ebert did not approve of an "all-woman" office, and that Ebert believed if one woman left, they would all leave. She further testified that no one, including Leahan, had ever indicated that she was being "demoted" for any reason other than because she purportedly hired too many women.

Plaintiff also recounted in her testimony other direct evidence of gender-based discriminatory motive or purpose. She recalled an incident which occurred in or about June of 1979 at a sales conference held in Acapulco, Mexico. Earlier she had sent Reserve Life's President, Douglas Pierce, a critical letter, and at the convention Pierce stated that he had not realized Plaintiff "was so high on this woman's thing." Pierce was further quoted as having said to Plaintiff's husband that Pierce could get along fine with her husband but not with the Plaintiff. On another occasion at a North Carolina convention in 1978, Pierce, in response to a comment made by a female employee, demonstrated how to crush out a cigarette with his foot, and was observed to state: "That's why I don't like *women* in management—they keep grinding and grinding."

21. Defendant has suggested that Plaintiff's demotion was the product of neutral, business reasons, having nothing to do with sex or gender. For the reasons already stated, we do not accept Defendant's justifications, and we find that gender-based discrimination played a substantial part in Reserve Life's decision to demote Plaintiff.

Defendant has contended that Plaintiff's demotion was simply the result of Reserve Life's decision to consolidate three of its Ft. Lauderdale offices into one, and its determination that Mike Schiff was more qualified to assume the position of district manager of this consolidated office than either Plaintiff or Roger Silversmith. Defendant has also argued that Plaintiff's performance in the area of recruitment was deficient, her overall attitude was bad, and her production had dropped.

Plaintiff has presented a substantial body of evidence which refutes each of these claims. Beyond the direct evidence of discriminatory purpose or intent, Plaintiff has pointed to her exemplary record with Reserve Life over many years. Moreover, the record evidence does not establish that Plaintiff was deficient in recruitment, or that the women whom she had hired were any less capable, dedicated or produc-

tive than men who were similarly selected as sales agents. Nor does the record evidence presented show that any other district manager had been demoted for any similar reason. We also observe that Plaintiff had played a major role in recruiting and training Mike Schiff, that Plaintiff had more seniority than Schiff, that Plaintiff, unlike Schiff, had experience managing multiple offices for Reserve Life, and that Plaintiff's past record of production had been superior to that of Schiff. Finally, we note in passing that the EEOC issued a determination finding reasonable cause to believe that the actions taken by Reserve Life against Plaintiff were the product of sex discrimination.

This Court will not substitute its judgment for the business judgment of Reserve Life as to the consolidation of three offices into one, or as to the selection of one district manager over another. Upon a full review of this record, we have been compelled, however, to find simply that the decision to demote Plaintiff was infused with gender-based discrimination.

22. Immediately following Plaintiff's demotion, and the consolidation of three Reserve Life Ft. Lauderdale offices under Schiff, Sennello took a previously scheduled vacation. Indeed, Plaintiff's supervisor had suggested that she take a vacation at that time.

Bill Leahan was terminated by Reserve Life early in December 1979 because of his involvement with another company, All Florida Insurance, which sold life insurance policies. Leahan apparently recruited Reserve Life personnel to write business on behalf of the new insurance company even though his arrangement with Reserve Life was to write exclusively Reserve Life policies. There is no evidence suggesting that Plaintiff played any role in the activities of All Florida Insurance.

Bob Adams, a fellow district manager, informed Plaintiff early in December 1979 that Leahan had been terminated by Reserve Life. Thereafter Plaintiff and Silversmith called Regional Manager Ebert and discussed Leahan's activities. Both agreed, at Ebert's request, to provide Re-

serve Life with an affidavit or deposition as to the matter. Plaintiff asked Ebert about her future with Reserve Life, and Ebert urged her to stay on with the Company.

23. On or about January 3, 1980, Plaintiff received a letter from Mr. Ebert, informing her that her employment as a sales agent with Reserve Life would be terminated as of January 10, 1980. Mike Schiff, who testified that Mr. Ebert sent this letter after consulting with him, opined that Plaintiff seemed as if she did not want to work for Defendant any more, that she did not take a sales desk, and that she generated no production between the time of her demotion, November 15, 1979, and her notification of termination on January 3, 1980. Ebert testified that Schiff wanted to terminate Plaintiff's contract as a sales agent and that he concurred. Ebert offered as the bases for terminating Plaintiff that she generated no production, never took a desk, and appeared to have little interest in the job. In a memorandum dated January 11, 1980, Schiff stated that the Plaintiff was terminated because he had not received any indication from Plaintiff that she wished to continue selling insurance for the company, and that she had generated no production. Since her termination, Plaintiff has never been offered a position by Reserve Life.

24. Upon a fair review of the record evidence, we find Defendant's proffered reasons for terminating Plaintiff wholly implausible and incredible. First, we observe that Plaintiff was terminated as an agent only six weeks after having been demoted as district manager. Notwithstanding Ebert's assurances to Plaintiff in early December 1979, Sennello was terminated in a time frame which can only be characterized as one of unusual haste. In view of her exemplary performance between 1972 and 1980, that haste appears even more unusual to us. Still more surprising is the suggestion that her lack of production during this six week period accounted for her termination. With the authorization of her superiors, Plaintiff took a vacation upon being demoted in mid-November 1979. Moreover, the Christmas season and indeed the whole month of December is a slow period for the sale of life and health insurance. Ms. Sennello's colleague, Bruce Robbins, testified that Reserve Life laid off telephone solicitors in December, that customers did not wish to be bothered by insurance agents during the Christmas season, and, accordingly, that Reserve Life agents regularly took their vacations during this slow period. We also observe that the testimony of Schiff and Ebert differed as to who was the "driving force" in terminating Plaintiff. Schiff suggested it was Ebert's decision, whereas Ebert contended that Schiff decided to terminate the Plaintiff, and Ebert simply ratified that decision. Finally, we can find no other example of a sales agent being terminated so quickly by Reserve Life for lack of production. To the contrary, the record has shown instances where a number of male agents were carried by Reserve Life for many months without production.

Following so closely upon the decision to demote Plaintiff in mid-November, we are left with the inescapable conclusion that Plaintiff's termination was justified by no genuine business purpose, but rather was also the result of gender-based discrimination. We can find no other plausible explanation for such a sudden termination of a sales agent who had been so productive over so many years.

25. We also find that Reserve Life made no genuine effort to rehire the Plaintiff in any capacity following her termination early in 1980.

26. Between 1974 and 1979, the Plaintiff earned the following sums of money from Reserve Life:

1974—$17,272.82
1975—$27,045.89
1976—$20,103.00
1977—$29,331.54
1978—$31,334.00
1979—$24.562.75.

Plaintiff earned an average of approximately $2,454.00 per month during the first eleven months of 1979. Plaintiff has also testified that her average annual medical insurance benefits while employed at Reserve Life totaled some $2,500; that her

average life insurance benefits totaled approximately $500; that her average annual retirement and profit sharing were $2,400; and that a category called "vacations and conventions" amounted to $4,000 per year. Defendant has offered no evidence or specific argument disputing these figures. Nevertheless, Plaintiff herself has testified as to the speculative nature of her claim that "vacations and conventions" yielded her annual benefits worth approximately $4,000. "I didn't have a number for this," she candidly admitted at trial.

27. Plaintiff has also testified and submitted a one-page statement showing her earnings from 1980 to 1985 to be the following:

 1980—$13,244.02
 1981—$9,256.00
 1982—$11,337.00
 1983—$7,191.00
 1984—$11,300.00
 1985—$10,126.00

The Defendant, we note, has offered no evidence challenging these figures.

28. Plaintiff has not shown with any degree of certainty what her income would have been from 1980 through the present, but for the acts of gender-based discrimination by Reserve Life. She has asked this Court to make that calculation by starting with 1978 as the base year, and calculating an 8% cost of living increase for each year from 1980 through 1986. Defendant, however, has argued that this proof is wholly inadequate to establish her damages; that Plaintiff's own evidence shows wide swings in her annual earnings; that wide annual fluctuations in income are common in this industry; that Plaintiff has offered no evidence as to what Mr. Schiff earned as a district manager, or as to the earnings of any other district manager in Florida, or elsewhere; and that Plaintiff has produced no evidence as to the Defendant's sales or products after 1979. In short, Defendant argues that Plaintiff has left this Court without any realistic basis for ascertaining damages.

29. Finally, Defendant has argued that Plaintiff has failed to mitigate damages, that she failed to seek any management

level insurance job from 1982 to the present time, and that she withdrew from the job market as of 1982. In the months and years following her termination from Reserve Life, Plaintiff did in fact take steps to find other positions in the insurance industry. Though some of the dates presented by Plaintiff in her direct testimony are imprecise, we are able to construct the following chronology from the evidence at hand:

30. Reasonably promptly upon her termination from Reserve Life, Ms. Sennello commenced a search for another managerial position in the insurance industry, as evidenced by the fact that in April 1980, she was hired as an assistant district manager for the American National Insurance Company. She worked for this company for only a short, though unspecified time, during which she earned a total of $2,809.24. While it is not clear when she left this position, the evidence does establish that, in June 1980, she accepted a position as district manager with another outfit, the World Insurance Company. She remained with this company until December 1980, earning $6,056.50 in fees, commissions, and other compensation. While she respected the medical and disability insurance "products" offered by World Insurance, she voluntarily resigned from her job in December following a contract dispute. She has described her reasons for leaving this position in only the briefest of terms: "They kept changing our contracts on us. Finally, it got down to November [1980] and the contracts weren't vested. One of the agents decided not to sign the contract, so we all decided collectively this probably wasn't the place for us."

31. Following her voluntary departure from the World Insurance job, Ms. Sennello made no apparent effort to find comparable employment in the insurance industry. Rather, she tells us only that, from December 1980 through March 1981, she "babysat" for an unspecified business which her husband had just begun. From all appearances, she was not paid for this undefined work.

32. In approximately March 1981, although again the date is not specified, Ms. Sennello joined a real estate publishing company called Real Estate Marketing, where her job was to sell advertising to various real estate companies. In describing this employment, Ms. Sennello stated only that it was in a field "that I didn't think I knew too much about." There is no evidence that she looked for employment comparable to her Reserve Life job before accepting this position.

33. In October 1981, Ms. Sennello became ill with a tumorous condition and had to quit her job with Real Estate Marketing. Shortly thereafter, she underwent surgery to have the tumor removed, and was unable to return to work until February 1982. At that point, she returned to the insurance industry, taking a job with a property and casualty insurance agency owned by a friend of hers. This employment continued until the early summer of 1982—yet again, no dates are provided—when she again became ill, this time with phlebitis in one of her legs. She spent two months hospitalized because of the phlebitis and another two months recuperating from this debilitating illness.

34. In October 1982, Ms. Sennello resumed work part-time, again assisting her husband in one of his business enterprises. Her physical condition remained delicate during this period, preventing her from riding in a car or from seeking full-time employment. As she has testified: "Any time I'd do something, my leg would flare up." She continued working in this capacity until her husband sold the business sometime in May 1983.

35. Ms. Sennello opened a small insurance agency of her own in approximately May 1983; she named the agency Gendra Sennello Insurance Associates. Initially working by herself, she became general agent for several companies and eventually hired a small number of brokers to work for her. As of the trial of this matter in September 1986, Ms. Sennello still owned and received income from the business.

36. In November 1985, a real estate marketing firm called Florida Showcase Publications contacted Ms. Sennello, inviting her to establish and head up a sales staff. She accepted the offer and began working for the company in December 1985. At the time of the trial, she was still in its employ, earning approximately $500 per week. In addition to this salary, Ms. Sennello testified that she received income from her insurance agency amounting to $400 to $500 per month. While she has listed her 1986 income as an estimated $20,000 for the year, we find from the available evidence that a more accurate, conservative estimate would be in the vicinity of $31,000 per year.

## II. CONCLUSIONS OF LAW

Our analysis of the law applicable to the facts set forth above follows two avenues. First, we address and respond affirmatively to the question of Reserve Life's liability to Plaintiff under Title VII. Second, we examine Plaintiff's claims for relief in light of the evidence presented and the applicable law on remedies in Title VII cases. Our conclusion, explained below, is that Plaintiff is entitled to back pay in the amount of $103,403.45, as well as reinstatement to a position at Reserve Life equivalent in pay and responsibility to the district managerial post from which she was forced to resign in November 1979.

*A. Reserve Life's Liability Under Title VII*

█ The Eleventh Circuit has accurately observed that employment discrimination in violation of Title VII of the Civil Rights Act of 1964 is seldom susceptible to proof by direct evidence. *Perryman v. Johnson Products Company,* 698 F.2d 1138, 1141 (11th Cir.1983). Where proof by direct evidence is not available, a legal framework has been established which allows a court to infer discriminatory motive on the basis of circumstantial evidence. *Id. citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).

The *McDonnell Douglas* framework comprises a three-part test which requires, first, that the Plaintiff establish a *prima facie* case of illegal discrimination. *Perryman,* 698 F.2d at 1141, *citing McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The elements deemed necessary to a *prima facie* showing of hiring discrimination under *McDonnell Douglas* have been broadened to apply to all types of employment-related discrimination. For example, a *prima facie* showing of discrimination in the termination of an employee is established where:

> "the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained."

*Id.* at 1142, *quoting Lee v. Russell County Board of Education,* 684 F.2d 769, 773 (11th Cir.1982). Once such a *prima facie* showing has been made under the *McDonnell Douglas* analysis, the burden shifts to the employer " 'to articulate some legitimate, non-discriminatory reason' " for the alleged discriminatory action. *Id.* at 1142, *quoting McDonnell Douglas* at 802, 93 S.Ct. at 1824. If the defendant meets this burden, the plaintiff must then carry the "ultimate burden of establishing by a preponderance of the evidence that a discriminatory intent motivated the employer's action." *Id.* at 1142, *citing McDonnell Douglas* at 804, 93 S.Ct. at 1825.

While employment discrimination charges may commonly be substantiable only through circumstantial evidence, the case at bar is one in which direct evidence of discrimination is available. In such instances, the *McDonnell Douglas* analysis does not apply. *McCarthney v. Griffin-Spalding County Board of Education,* 791 F.2d 1549, 1553 (11th Cir.1986); *Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 875 (11th Cir. 1985); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385,

81 L.Ed.2d 344 (1984). When direct evidence of discrimination has been introduced, the court must determine, as an initial matter, whether or not it believes the proffered evidence. *Thompkins,* 752 F.2d at 564. If the factfinder credits the direct evidence, thereby concluding that discriminatory intent existed, "a presumption is created that the unfavorable employment action was the product of the discriminatory intent." *Hill v. Seaboard Coast Line Railroad Co.,* 767 F.2d 771, 775 (11th Cir. 1985); *see also Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983). This presumption, in turn, "may only be rebutted by a showing by the employer by a *preponderance* that the [adverse employment] action would have been taken in the absence of the discriminatory intent." *Hill,* 767 F.2d at 775 (emphasis in original); *see also Lewis v. Smith,* 731 F.2d 1535, 1539 (11th Cir.1984); *Bell v. Birmingham Linen Service,* 715 F.2d at 1558; *Perryman,* 698 F.2d at 1143.

Plaintiff in the present case, Gendra Sennello, has clearly introduced direct evidence which establishes that Reserve Life exhibited discriminatory animus toward her as a woman in management, and toward female managers in general. According to the testimony of Ms. Sennello's immediate superior, William Leahan, which we do credit, William Ebert, who as Florida Regional Manager held the power to hire and fire district managers such as Plaintiff, made a number of highly discriminatory comments about women in management in the weeks and months preceding the demotion and subsequent firing of Ms. Sennello. We note in particular his remark, made in 1979, that "we can't have women in management because women are like Jews and Niggers; they hire like themselves, and the trouble with that is that when they leave they take them with them." The relevance of this remark to Reserve Life's employment practices is highlighted by the fact that it was made in the course of a discussion with Plaintiff's immediate superior, Mr. Leahan, about ways to increase production and manpower in each of the thirteen district offices under Mr. Leahan's supervision.

Within this same context, Mr. Ebert criticized Plaintiff's performance as a district manager on the ground that she had hired too many women. Mr. Ebert's displeasure with Ms. Sennello's hiring practices was communicated to Ms. Sennello by Mr. Leahan, who told her that the Regional Manager was unhappy with the "gender make-up" of her offices. Later that same year, in November 1979, Mr. Leahan was ordered by Mr. Ebert to fire Ms. Sennello. Meeting with Ms. Sennello pursuant to this order, Mr. Leahan urged her to resign her position immediately, explaining that her removal had been called for because of her failure to hire enough men in her offices.

Further direct evidence of Defendant's discriminatory animus toward women in management arises from Plaintiff's own testimony regarding comments made by Reserve Life's President, Douglas Pierce, on two separate occasions. First, we take note of his derisive remark in response to a critical letter by Plaintiff, at a sales conference in Acapulco, that he had not realized Plaintiff "was so high on this woman's thing." Second, and more blatantly discriminatory, was Mr. Pierce's behavior at a North Carolina convention in 1978. As mentioned in our Findings of Fact, he responded to a comment by a female employee at this convention by demonstrating how to crush out a cigarette with his foot and stating: "That's why I don't like *women* in management—they keep grinding and grinding."

Given Plaintiff's presentation of direct evidence as to Reserve Life's discriminatory animus regarding women in management, Reserve Life can only defend against Plaintiff's Title VII claims by making a preponderant showing that its actions against her—demotion in November 1979 and termination in January 1980—would have been the same even absent any discriminatory animus. Upon a careful review of the record evidence, we have concluded that the Defendant has failed to make such a showing. Defendant has argued that Plaintiff's demotion occurred as part of Reserve Life's reorganization and consolidation of its three Ft. Lauderdale-area offices. In merging three district offices into one, Defendant has maintained that a decision had to be made as to which of the three district managers, if any, was best suited to the task of managing the expanded district office. The selection of Mike Schiff rather than Gendra Sennello for this position, Defendant has asserted, was based upon a determination that Mr. Schiff was better qualified for the job. In addition to alleging that Ms. Sennello's recruitment efforts were unduly biased toward the hiring of women, Defendant has contended that her overall attitude was poor and her productivity had markedly declined.

Plaintiff, on the other hand, has presented a substantial body of evidence showing her to have been extremely well-qualified for the consolidated district managerial post. For more than six years preceding her demotion and termination, she had held a variety of district managerial positions with Reserve Life, and for more than a year prior to the contested employment action, she had been a district manager in one of the three Ft. Lauderdale offices involved in the November 1979 consolidation. Her training and experience were thus tailor-made to the job which she was denied. More to the point, the testimony of several of Ms. Sennello's co-workers— Messrs. Crooks, Leahan, Robbins, Silversmith, and Adams—was uniformly laudatory of Plaintiff's capability and performance as a district manager. Additionally, we note that none of the testimonial evidence credibly substantiated the Defendant's claim that Mike Schiff, who was hired to fill the consolidated managerial slot, was better qualified for the job than Ms. Sennello. The testimony showed Plaintiff to have had more managerial experience than Mr. Schiff and a record of production superior to that of Mr. Schiff.

We do not dispute Reserve Life's exercise of managerial prerogative in consolidating its three Fort Lauderdale offices in the fall of 1979. We do find, however, that the company has failed to meet its rebuttal burden of showing that Ms. Sennello would have been demoted even in the absence of discriminatory animus. *See Hill v. Sea-*

*board,* 767 F.2d at 775; *Lewis v. Smith,* 731 F.2d at 1539; *Bell v. Birmingham,* 715 F.2d at 1558; *Perryman v. Johnson Products,* 698 F.2d at 1143. More directly, we believe and find explicitly that Reserve Life's decision to demote Ms. Sennello was substantially infused with gender bias. Plaintiff's direct evidence of discriminatory animus is therefore sufficient to sustain its Title VII claims vis-a-vis Reserve Life's forced demotion of Gendra Sennello in November 1979.

■ Similarly without any real support is the Defendant's rebuttal of Plaintiff's claim that Reserve Life was motivated by gender-bias in its decision to fire Gendra Sennello in January 1980. Reserve Life's regional manager, Mr. Ebert, testified that Ms. Sennello was terminated as a Reserve Life agent because she generated no production, never took a desk, and appeared to have little interest in the job. As we have noted in our Findings of Fact, we find these explanations highly implausible as bases for the precipitous termination of Ms. Sennello's employment. Ms. Sennello, at the time of her demotion to sales agent, had been employed by Reserve Life for approximately seven years, and throughout this period she had a record of excellent service. Immediately following her demotion in mid-November 1979, she took a previously planned and approved vacation, returning to work on or about December 1, at the outset of the Christmas season, widely regarded as a very slow period for the sale of life and health insurance. On or about January 3, 1980, only six weeks after her demotion and just a month after she returned from her authorized vacation, Ms. Sennello received a letter terminating her employment as an agent with Reserve Life, effective January 10, 1980. [Plaintiff's Exhibit 38.]

The haste with which the decision to terminate Ms. Sennello was reached and implemented leads us to the conclusion that her firing was by no means free of the discriminatory animus which led to her earlier demotion. As we have noted, the record reveals no other instance in which a sales agent has been terminated so swiftly

by Reserve Life for lack of production. To the contrary, the evidence indicates that substantially longer periods of non-production by *male* sales agents have been tolerated by the company. The timing of Ms. Sennello's firing—immediately after the slow Christmas season—makes the short time-frame of Ms. Sennello's employment as a sales agent even more remarkable, strengthening our conclusion that gender discrimination significantly contributed to this final adverse action against the Plaintiff. And finally, we note that the individual who certainly ratified and possibly instigated the firing of Ms. Sennello was the same individual—Mr. Ebert—who had ordered her prior removal as district manager and had earlier made a number of highly derisive comments about women in management.

These circumstances surrounding Ms. Sennello's termination as a Reserve Life sales agent persuade us that, here too, the Defendant has failed to rebut Plaintiff's compelling direct evidence of discriminatory animus among key Reserve Life officers. The evidence presented by the Defendant does not preponderantly show, as required for a successful rebuttal of direct evidence, that the same adverse employment action would have been taken by Reserve Life "in the absence of the discriminatory intent." *Hill v. Seaboard Coast Line Railroad Co.,* 767 F.2d at 775. We therefore find that Plaintiff has successfully proven her claim that Reserve Life was unlawfully motivated by discriminatory animus in its decision to terminate Gendra Sennello's employment, in violation of Title VII of the 1964 Civil Rights Act.

In sum, we find that the record clearly establishes, through direct evidence, that Defendant Reserve Life is liable under Title VII with respect to both the forced demotion of Gendra Sennello in November 1979, and the decision to fire her as a sales agent in January 1980. As we have stated earlier, a determination of liability under the "direct evidence" test applicable here obviates the need to assess liability via the *McDonnell Douglas* analysis, whose applicability is confined to cases where the only evidence of discrimination marshalled by

the Plaintiff is circumstantial.[1] The only remaining questions therefore pertain to a determination of the nature and extent of relief to which Ms. Sennello is entitled under the circumstances.

### B. *Relief Due to Plaintiff Under Title VII*

■ Both the Supreme Court and the United States Congress have unequivocally assigned broad discretion to the federal trial courts in fashioning appropriate remedies under Title VII. Under the statutory language itself, relief to those aggrieved by employment-related discrimination can include "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g) (1976). Drawing upon the legislative history of this provision, the Supreme Court has placed a generous gloss on the scope of remedies available under Title VII:

> Last Term's *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 45 L.Ed.2d 280, 95 S.Ct. 2362 (1975), consistently with the congressional plan, held that one of the central purposes of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*, at 418, 45 L.Ed.2d 280, 95 S.Ct. 2362 [2372].... The legislative history supporting the 1972 amendments of § 706(g) of Title VII [42 U.S.C. § 2000e–5(g) ] affirms the breadth of this discretion. "The provisions of [§ 706(g) ] are intended to give the courts wide discretion exercising their equitable power to fashion the most complete relief possible.... [T]he Act is intended to make the victims of unlawful employment discrimination whole, and ... the attainment of this objective ... requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to

a position where they would have been were it not for the unlawful discrimination." Section-by-Section Analysis of HR 1746, accompanying the Equal Employment Opportunity Act of 1972—Conference Report, 118 Cong.Rec. 7166, 7168 (1972).

*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1263–64, 47 L.Ed.2d 444 (1976) (footnote omitted).

This Circuit, in determining the scope of relief available under Title VII, has mirrored the Supreme Court's vision of broad trial court discretion. In a case involving racial discrimination, the Circuit has held:

> The aim of Title VII relief, whether backpay, retroactive seniority, or other injunctive relief, is thus to make whole the victims of discrimination according to what would have been their experience in a non-discriminatory work setting.

*Claiborne v. Illinois Central Railroad*, 583 F.2d 143, 149 (5th Cir.1978); *see also Mims v. Wilson*, 514 F.2d 106, 109 (5th Cir.1975). In a more recent sex discrimination case brought under Title VII, the Circuit has declared it to be the trial court's "duty ..., after a finding of discrimination, to place the injured party in the position [in which] he or she would have been absent the discriminatory actions." *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir.1985) (citations omitted).

Defendant has argued that Ms. Sennello, to the extent that she performed as an insurance agent for Reserve Life either before or after her demotion from district manager in November 1979, was an independent contractor in relation to Reserve Life and was therefore not entitled to recovery under Title VII. This position clearly runs counter to the Supreme Court's recent ruling in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The Court in that case, holding that a female associate in a law partnership

---

**1.** We do note, however, that if we were to apply the *McDonnell Douglas* analysis to the present case, the Plaintiff would also be found to have established her claim of intentional discrimination by a preponderance of the evidence, as required by the Supreme Court in that case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 6 L.Ed.2d 668 (1973).

had stated a viable claim under Title VII by alleging that the partnership had discriminated against her when it failed to invite her to become a partner, declared:

> An employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract. Such a benefit, though not a contractual *right* of employment, may qualify as a "privileg[e]" of employment under Title VII. A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. Those benefits that comprise the "incidents of employment," S Rep No. 867, 88th Cong. 2d. Sess., 11 (1964), or that form "an aspect of the relationship between the employer and employees," *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178, 30 L.Ed.2d 341, 92 S.Ct. 383 [397] (1971), may not be afforded in a manner contrary to Title VII.

*Id.* at 75–76, 104 S.Ct. at 2233–34 (footnotes omitted).

In the present case, there is no dispute as to the fact that, as a district manager, Ms. Sennello was an employee of Reserve Life, within the meaning of Title VII. Her work as an agent, moreover, was integrally related to her status as a district manager; indeed, it can be accurately stated that her work and compensation as an agent were among the "privileges" of her employment as a district manager, under Title VII. Accordingly, any protection to which she was entitled by virtue of her managerial position extended to her simultaneous interests as an agent of the company, under *Hishon.*

By logical extension, we also find that Ms. Sennello's position as a Reserve Life agent following her demotion was protected under the statute. It would be grossly unjust if employers such as Reserve Life could limit their liability under Title VII by demoting unwanted managers to an unprotected status shortly before actually firing them. Ms. Sennello's agency status, as an "incident" of her former managerial em-

ployment, did not lose its Title VII protection simply because she was demoted from her managerial employment six weeks before she was terminated by Reserve Life.

### 1. *Back pay*

#### a. *Overview*

Back pay has consistently been regarded by the courts as a presumptive right of individuals who, because of discrimination, have been denied employment opportunities, through termination, demotion, non-promotion, or the failure to hire. The Supreme Court has been unequivocal in this regard:

> [G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (footnote omitted). Presumptive entitlement to back pay has similarly been declared by this Circuit and the former Fifth Circuit. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1472 (11th Cir.1985); *Lewis v. Smith,* 731 F.2d 1535, 1538 (11th Cir.1984); *McCormick v. Attala County Board of Education,* 541 F.2d 1094, 1095 (5th Cir.1976).

The calculation of a back pay award should not be confined to the mere provision of "straight salary," but rather should embrace fringe benefits such as health insurance coverage, life insurance benefits, annual retirement contributions, and profit sharing. *See, e.g., Cox v. American Castiron Pipe Co.,* 784 F.2d 1546, 1562 (11th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986), *citing Pettway v. ACIPCO,* 494 F.2d 211, 263 (5th Cir. 1978) (overtime, shift differentials, bonuses, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay).

In keeping with the objective of making the injured party whole, however, a back pay award under Title VII should be

limited to proven economic loss. *Darnell v. City of Jasper, Alabama,* 730 F.2d 653, 656 (11th Cir.1984); *Marks v. Prattco, Inc.,* 607 F.2d 1153, 1155–56 (5th Cir.1979). More particularly, the discriminatee has a duty to minimize damages by seeking alternative employment. *Darnell,* 730 F.2d at 656. The statute itself declares in this regard:

> Interim earning or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g) (1976).

■ To qualify for full back pay throughout the pre-judgment period, a discriminatee need not engage ceaselessly in a search for alternative employment. Rather, if a discriminatee fails to find suitable work despite genuine and sustained efforts toward that end, she can abandon the search after a reasonable period without jeopardizing her right to full back pay. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1471–72 (11th Cir.1985). In *Nord,* a Title VII claimant relinquished her search for comparable substitute employment after two-and-one-half years, turning her attention instead to the creation of a business with her husband which would provide for her future employment. The Eleventh Circuit upheld the claimant's entitlement to full back pay throughout the six to eight months that she worked without pay for her husband, declaring her job search "fruitless" and describing as "reasonable" her effort to establish secure future employment by assisting in her husband's business. *Id.* at 1472.

■ Clearly, the "reasonable diligence" standard set forth in the statutory language does not require a wrongfully discharged employee to search indefinitely for substitute employment; the employee must merely "use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. Equal Employment Opportunity Commission,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982); *see also Brady v. Thurston Motor Lines,* 753 F.2d 1269, 1273 (4th Cir.1985). To meet this requirement, the discriminatee "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC,* 458 U.S. at 231, 102 S.Ct. at 3065 (footnote omitted). Moreover, where a claimant, after failing despite diligent efforts to find comparable employment, has accepted a lower paying job, the duty to mitigate does not require him or her to continue a search for higher paid employment. *Brady v. Thurston Motor Lines,* 753 F.2d at 1274.

■ Once comparable substitute employment has been found, however, the Title VII claimant faces certain obligations vis-a-vis the retention of that employment; namely, the discriminatee must make "reasonable and good faith efforts" to retain the job. *Brady v. Thurston Motor Lines,* 753 F.2d at 1277. "[A] claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages." *Id.; see also National Labor Relations Board v. Aycock,* 377 F.2d 81, 88 (5th Cir.1967); *National Labor Relations Board v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir.1966).[2] Where Title VII claimant voluntarily quits a comparable interim job, "back pay should be decreased by the

---

2. We note that the *Aycock* and *Miami Coca-Cola* cases involve discrimination claims brought under the National Labor Relations Act. Their applicability to the case at bar, however, has been clearly established by the Supreme Court, which has declared that the back pay provision of Title VII, § 706(g), was "'expressly modeled'" on the analogous remedial provision of the National Labor Relations Act, § 10(c), 49 Stat. 454, as amended, 29 U.S.C. § 160(c). *Ford Motor Co. v. Equal Employment Opportunity Commission,* 458 U.S. 219, 226, n. 8, 102 S.Ct. 3057, 3062 n. 8, 73 L.Ed.2d 721 (1982), *quoting*

*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419 and n. 11, 95 S.Ct. 2362, 2372 and n. 11, 45 L.Ed.2d 280 (1975). We further note that the Eleventh Circuit explicitly followed NLRB practice and decisions under the NLRA when it held that state unemployment compensation benefits may not be deducted from a Title VII back pay award. *Brown v. A.J. Gerrard Manufacturing Co.,* 715 F.2d 1549, 1550 (11th Cir.1983); *see also Darnell v. City of Jasper, Alabama,* 730 F.2d 653, 657 and n. 3 (11th Cir.1984) (applying NLRB "quarterly earnings formula" in the context of a Title VII action).

amount he would have earned had he not quit." *Brady v. Thurston Motor Lines,* 753 F.2d at 1273; *see also NLRB v. Aycock,* 377 F.2d at 87; *NLRB v. Miami Coca-Cola,* 360 F.2d at 575.

 The rule that voluntary termination of interim employment reduces the subsequent back pay award by the amount of earnings voluntarily foregone is not unqualified, however. While we have found no authority directly on point within this Circuit, it is broadly established that the back pay award to a claimant who voluntarily terminates interim employment should only be reduced if the claimant lacked "compelling or justifying reasons" for having quit the job. *Brady,* 753 F.2d at 1278, *citing Knickerbocker Plastics Co.,* 132 NLRB 1209, 1212 (1961). "[A] voluntary quit does not toll the period when it is prompted by unreasonable working conditions or the earnest search for better paying employment." *Id., citing NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 174, n. 3 (2d Cir.1965), *cert. denied,* 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); *Stone v. D.A. & S. Oil Well Servicing, Inc.,* 624 F.2d 142, 144 (10th Cir.1980); *Shell Oil Co.,* 218 NLRB 87, 89 (1975); *John S. Barnes Corp.,* 205 NLRB 585, 588 (1973); *Winn-Dixie Stores, Inc.,* 170 NLRB 1734, 1744 (1968).

Given the Supreme Court's declaration that the back pay provision of Title VII was expressly modeled on the analogous provision of the National Labor Relations Act, *Ford v. EEOC,* 458 U.S. at 226, n. 8, 102 S.Ct. at 3062 n. 8, we find the manner in which the National Labor Relations Board has implemented the NLRA provision to be highly instructive. Particularly helpful is the method proposed by the NLRB for calculating the appropriate offset to a full back pay award in cases where claimants have unjustifiably quit interim employment:

> [A]n offset ... will be deducted as interim earnings from the gross backpay of each of these claimants. This offset shall be made applicable from the date of the unjustified quitting throughout the remainder of the backpay period for each particular claimant. In this connection, where the claimant has secured other employment during the time that the offset is applicable, and if, on a quarterly basis, she earned a greater amount than the offset, the offset will not be applied, but the actual interim earnings will be deducted from gross backpay. If she earned less than the offset at employment secured subsequent to the quitting, also on a quarterly basis, the amount of the offset will be applied.

*Knickerbocker Plastics Co.,* 132 NLRB at 1215. The method has been mirrored by the former Fifth Circuit in *NLRB v. Aycock,* under the rationale that "[t]he discriminator must not be liable for the discriminatee's losses when those losses have not been caused by the discriminator." 377 F.2d at 88; cf. *Brady v. Thurston,* 753 F.2d at 1279–80 (*Knickerbocker* rule explicitly adopted, with the exception that periods of unemployment following justified *discharges* from interim employment were completely excluded from back pay).

 Before we return to an analysis of the particular case before this Court, a few observations about the burden of proof as to damages in Title VII cases are in order. As the first step in calculating the back pay owed to a claimant by an employer found liable under Title VII, the claimant must establish what he or she contends to be the damages resulting from the discriminatory acts of the employer. *Nord v. U.S. Steel,* 758 F.2d at 1470; *see also J.H. Rutter Rex Manufacturing Co. v. NLRB,* 473 F.2d 223, 230–31 (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973) (primary duty of NLRB General Counsel in back pay proceedings is to show the gross back pay due each claimant); *NLRB v. Miami Coca Cola Bottling Co.,* 360 F.2d 569, 576 (5th Cir.1966) (NLRB General Counsel bears burden of proving damages). Once such a showing has been made, the burden shifts to the employer to prove that the claimant is not entitled to the full amount of back pay sought. *Nord,* 758 F.2d at 1470; *Rutter Rex Manufacturing,* 473 F.2d at 231; *Miami Coca-Cola Bottling,* 350 F.2d at 576; *Brady v. Thurston,* 753 F.2d at 1274. This latter burden can

be met by the production of evidence establishing the amount of interim earnings received by the claimant, or through evidence showing that the claimant failed to exercise diligence in searching for or retaining interim employment. *See Nord,* 758 F.2d at 1470; *Miami Coca-Cola Bottling,* 360 F.2d at 576 (burden on employer to prove facts mitigating the extent of damages); *Brady v. Thurston,* 753 F.2d at 1274 (burden on employer to prove plaintiff failed to exercise diligence in seeking employment); *Rutter Rex Manufacturing,* 473 F.2d at 231, 241–42 (defendant's burden to show that plaintiff failed to remain in the labor market, refused to accept substantially equivalent employment, failed to search diligently for alternative work, or voluntarily quit alternative employment).

There are cases such as the one at bar, however, where the defendant claims that the plaintiff is not entitled to full back pay but submits no evidence other than plaintiff's testimony to substantiate its assertions. Under these circumstances, the trial court must determine the amount of back pay due by evaluating the credibility and sufficiency of plaintiff's testimony. *See Nord,* 758 F.2d at 1471 ("defendant left the determination of plaintiff's diligence to be decided by the court based upon its assessment of plaintiff's credibility").

b. *The Baseline Back Pay Award*

 Having established the relevant criteria for determining entitlement to back pay and for calculating the actual amounts due once entitlement has been established, we must apply these guidelines to Ms. Sennello's employment history following her termination from Reserve Life in January 1980. At the outset, we must fairly determine what Ms. Sennello would have earned if she had continued to be employed by Reserve Life as a district manager. The Eleventh Circuit has stated in this regard

"... Loss of pay shall be determined by deducting from a sum equal to that which [the employee] would normally have earned for each such quarter or portion thereof, [his] net earnings, if any, in other employment during that period."

*Darnell v. City of Jasper, Alabama,* 730 F.2d 653, 657 (11th Cir.1984), *quoting NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 345, 73 S.Ct. 287, 288, 97 L.Ed.2d 377 (1953), *quoting F.W. Woolworth Co.,* 90 NLRB 289, 292–93 (1950) (footnote omitted).

A lack of relevant information hampers us in determining what Ms. Sennello would have earned if she had remained a district manager at Reserve Life during the disputed period. We are told what Ms. Sennello earned as a district manager from 1974 through 1979, but we are given no information as to the earnings from 1980 to the present of Mr. Schiff, who was hired to serve as district manager in the consolidated Ft. Lauderdale district in November 1979. Nor are we given any indication as to the earnings of other Reserve Life district managers in Florida or elsewhere during the relevant period. When questioned as to the absence of such data during closing arguments, Plaintiff's counsel explained that the pay structure for Reserve Life district managers, combining a guaranteed salary and overwrite with a commission on subordinates' transactions, is highly reflective of individual managerial style, thus rendering one manager's earnings an inaccurate reflection of what another individual might have made in the same position. The Defendant, we should add, also made no proffer of evidence as to district managerial earnings in the 1980's even though Defense counsel, in closing, criticized Plaintiff for failing to provide such information.

Despite this paucity of evidence as to Reserve Life's salary structure and the earnings of district managers *after* Ms. Sennello's termination, we are by no means lacking in information relevant to determining an appropriate back pay award in this case. Ms. Sennello has provided a statement of her earnings from 1974 through 1979, throughout which period she was employed as a district manager. [*See* "Statement of Losses," Plaintiff's Ex. 58.] As the accuracy of these figures has not been contested by Defendant, we shall treat them as a reliable starting point in calculating the back pay to which Ms. Sennello is

entitled. In relying upon these figures rather than treating the absence of more timely data as fatal to Plaintiff's quest for damages, we are mindful of the former Fifth Circuit's admonition in a Title VII case that "[a]ny doubts in proof should be resolved in favor of the discriminatee giving full and adequate consideration to applicable equitable principles." *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1380 (5th Cir.1974) (footnote omitted). In the same decision, the Fifth Circuit observed: "[M]any equitable considerations will enter into any resolution of entitlement, but onerous and speculative limitations should not be utilized as a bar to the restoration process." *Id.* (footnote omitted); *see also Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir.1975) ("unrealistic exactitude" not required in back pay determinations; uncertainties in determining what a discriminatee would have earned should be resolved against the discriminating employer); *Ackerman v. Western Electric Co.*, 643 F.Supp. 836, 854 (N.D.Cal.1986).

Equitable considerations, however, prevent us from relying upon Plaintiff's "Net Loss" estimates which appear on the same sheet as her listing of 1974–79 earnings. Ms. Sennello arrived at her "net loss" estimates by subtracting her actual income during each of the post-termination years (1980–86) from an estimate of what she would have earned during those years if she had remained at Reserve Life. To determine the latter figures, she used 1978 —her year of highest earnings during the 1974–79 period—as the base-year and adjusted this figure upward according to an assumed increase in the cost of living of eight per cent per year throughout the entire post-termination period. We reject this calculation method on two grounds: first, Ms. Sennello has given us no reasoned basis for using 1978, her year of highest earnings, as the base-year; and second, she has provided no substantiation for her asserted entitlement to an eight per cent annual cost-of-living adjustment.

A cost-of-living adjustment might reasonably have been a factor in our arriving at a fair back pay award to Ms. Sennello, if the quest for such damages had been backed by a proffer of reliable evidence. Such a proffer might have included published regional data from Bureau of Labor Statistics, or far more persuasively, testimony backed by documentary evidence showing the cost-of-living adjustments actually provided to Reserve Life managers during each of the relevant years. Even if significant cost-of-living increases occurred—as we have little doubt—during the 1980–86 period, we cannot reasonably assume that Reserve Life provided its employees with adjustments fully or even partially taking these increases into account. The corporation's degree of responsiveness to cost-of-living increases presumably would have depended upon a host of factors: the company's economic performance in a given year and the degree of competitiveness in the industry are only a few such examples. As no information relevant to our determining a fair cost-of-living adjustment was presented, we decline to speculate as to this matter or to include such an adjustment in our back pay award.

We also take issue with Ms. Sennello's selection of 1978 as the base-year for her back pay calculations. Nowhere in her testimony or exhibits has she explained why her year of highest earnings, rather than her most recent year or some multi-year average of earnings, should play such a determinative role. To rely upon this possibly exaggerated baseline figure would be patently unfair to the Defendant, given the absence of any clear justification for its use. Instead, we have decided to derive a baseline earnings figure from the average of Ms. Sennello's final 48 months as a Reserve Life district manager. This period would therefore run from November 1, 1975, through October 31, 1979—her last full month as a district manager. Applying this formula, we find Ms. Sennello's back pay entitlement, prior to the inclusion of insurance and other benefits and before subtracting any amounts earned or earnable pursuant to 42 U.S.C. § 2000e–5(g), to

be $2,288.31 per month, or $27,459.73 per year.[3]

In arriving at a total base-level back pay award, we must add to the just-cited earnings figures all reasonably calculable benefits which Plaintiff earned while employed at Reserve Life. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). Ms. Sennello has listed the annual benefits to which she claims entitlement as: medical insurance, $2,500.00; life insurance, $500.00; retirement and profit sharing, $2,500.00; and vacations and conventions, $4,000.00. [Plaintiff's Ex. 58.] Curiously, the Defendant did not challenge any of these assertions even when the Court specifically invited a discussion of the damages issue during closing arguments. Moreover, in cross-examining Ms. Sennello during the trial, defense counsel categorically stated that the Defendant had no objection to Ms. Sennello's statement of income—presumably including her fringe benefits—during her years at Reserve Life. Finally, the Defendant's post-trial memoranda fail to take specific issue with Plaintiff's fringe benefit assessments.

Even absent any opposition by Defendant to Plaintiff's fringe benefit claims, we must take issue with one such assertion: her annual estimate of $4,000.00 for "vacations and conventions." In her own testimony, Ms. Sennello acknowledged the arbitrary nature of this claim. "I didn't have a number for this," she said. Without offering any substantiation as to the amount of paid vacation time offered by Reserve Life or the nature of convention activities and accommodations, she simply observed: "I haven't had a vacation since then." Given the wholly unsubstantiated nature of this claim, we must conclude that the $4,000.00 which Ms. Sennello seeks to recover annually for vacations and conventions cannot be included in our back pay calculations.

Plaintiff's asserted benefits vis-a-vis health and life insurance as well as retirement and profit-sharing are only somewhat better substantiated than her "vacations and conventions" claim. Nevertheless, Plaintiff has offered uncontroverted testimony that she paid individually for these benefits following her termination, and as Defendant has not refuted her enjoyment of these forms of protection while a Reserve Life employee, they shall be included as part of the back pay award. Again, in this regard, we remind ourselves of the *Johnson v. Goodyear* admonition that any doubts in proof are to be resolved in favor of the discriminatee. 491 F.2d at 1380. Factoring these allowed fringe benefits into our baseline back pay calculation, we arrive at a monthly back pay entitlement of $2,746.64 and a yearly entitlement of $32,959.73.

#### c. *Deduction for Amounts Earned or Earnable*

Having established what Ms. Sennello's baseline back pay award should be, we must next examine her post-termination employment history to determine the amounts by which this award should be reduced at various points to account for sums actually earned by Ms. Sennello, or sums earnable by Ms. Sennello if she had exercised "reasonable diligence" in searching for or retaining subsequent employment. In this inquiry, too, we are impeded by Plaintiff's imprecision with respect to the starting and ending dates for various periods of employment as well as the amounts earned in certain of these contexts. Showing the necessary deference to the discriminatee's presumptive entitlement to back pay, we are nevertheless able to arrive at figures which, if not absolutely precise, are a fair approximation of what Plaintiff is due. Here again, we note that Defendant has put forth no specific rebuttal of Plaintiff's assertions as to the amounts she earned during different phas-

---

**3.** Ms. Sennello's average monthly earnings in 1975, based on her stated total earnings of $27,045.89 for that year, were $2,253.82. In 1976, the comparable figure—based on annual earnings of $20,103.00—was $1,675.25 per month. In 1977, her average monthly earnings rose to $2,444.30, based on an annual income of $29,331.54. The monthly figure rose again in 1978 —to $2,611.17, based on annual earnings of $31,334.00. Finally, during the first ten months of 1979 she earned a total of $24,562.75, or an average of $2,456.28 per month.

es of this post-termination period, nor has Defendant challenged in any meaningful way the comparability of her various post-termination employment positions to her previous job status at Reserve Life.

Within just a few months of her termination date, Plaintiff landed her first substitute job as an assistant district manager for the American Insurance Company. (She was fired on January 2, 1980, and began work for the American Insurance Company sometime in April 1980.) While no details have been provided as to the nature of Plaintiff's job search in the immediate aftermath of her termination, we find the comparability of her position with American Insurance and the relatively short period of unemployment prior to her commencement of that job to be sufficient indicia that Plaintiff sought this employment with "reasonable diligence," as required under the back pay provisions of Title VII. While she remained at this job for only a short time, she promptly obtained other suitable work: in June 1980, she was hired as a district manager by the World Insurance Company. By the time she voluntarily quit that job, sometime in December 1980, she had earned $6,056.50 in fees, commissions, and other compensation.

The first relevant period in computing a fair back pay award, then, is from January through December 1980. The evidence has revealed that Ms. Sennello was terminated by Reserve Life on January 10, 1980. For purposes of estimation, we shall assume that she quit her job at the World Insurance Company on November 30, 1980.[4] For the nearly eleven months which passed between these two events, Ms. Sennello's back pay award—before subtracting actual earnings—can be derived by pro-rating her $32,959.73 annual back pay entitlement, arriving at a figure of $29,257.40 for this period. Her actual earnings for the same period can be similarly derived from Ms.

Sennello's own statement that she earned $13,244.02 in 1980. [Plaintiff's Ex. 58.] Pro-rating this latter figure, we can infer that Ms. Sennello actually earned $11,756.33 from January 10 through November 30, 1980. Her back pay award for this period can be obtained by subtracting these earnings from her pro-rated baseline back pay award of $29,257.40, arriving at an award of $17,501.07 for this period.

From the evidence before us, it does not appear that Ms. Sennello had "compelling or justifying reasons" for leaving her position with the World Insurance Company. See Brady v. Thurston Motor Lines, 753 F.2d 1269, 1278 (4th Cir.1985); Knickerbocker Plastics Co., 132 NLRB 1209, 1212 (1961). Ms. Sennello's brief references in her trial testimony to a contractual dispute with her employer are not sufficient, without further amplification, to justify her voluntary resignation from a managerial position with an insurance company which, by her own admission, marketed "wonderful major medical" and "good disability" policies. Casting yet further doubt upon the sagacity of her resignation is the fact that, at the time of her quitting, she made no apparent effort to find comparable or better employment in the insurance field. To the contrary, she spent the ensuing months—until March 1981—"babysitting" for a business which her husband had just started. As Plaintiff has presented no details as to the nature of this enterprise or her responsibilities with respect to it, we can only conclude that her work was not comparable to that which she had voluntarily quit. Among other relevant factors, the work for her husband's business was without pay.

As Ms. Sennello left her employment at World Insurance without adequate justification and failed to make any perceptible efforts to find comparable or superior employment immediately thereafter, her back pay award for the December 1980–March

---

4. The evidence does not reveal exactly when Ms. Sennello quit her job at the World Insurance Company. Wherever, as here, Plaintiff does not reveal the exact date of a particular employment-related event, we shall assume for estimation purposes that the applicable starting date

for a period of employment, unemployment, or illness is the first day of the referenced month, and that the applicable end-date for such periods is the final day of the month *preceding* the referenced month.

1981 period should be decreased by the amount she would have earned if she had remained at World Insurance. *Brady v. Thurston Motor Lines,* 753 F.2d at 1273, *see also NLRB v. Aycock,* 377 F.2d 81, 88 (5th Cir.1967); *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir. 1966); *Knickerbocker Plastics,* 132 NLRB at 1215. We shall assume for purposes of estimation that her work at World Insurance began on June 1, 1980, and ended on November 30, 1980; similarly, we shall posit that her "babysitting" work for her husband's business was completed on February 28, 1981. Thus, her back pay award for each of these three months should equal her pro-rated baseline back pay award ($2,746.64 per month) minus the estimated average amount earned by Ms. Sennello during her five months of employment with World Insurance. We know from the "W-2" income tax forms submitted as evidence by Ms. Sennello that she earned a total of $6,056.50 during her tenure at World Insurance. [Plaintiff's Ex. 58.] Her average monthly earnings during her estimated five months as a World Insurance employee therefore amounted to $1,211.30. Subtracting this sum from her baseline monthly entitlement, we find that Ms. Sennello should be awarded $1,535.34 per month in back pay, totaling $4,606.02 for the three-month period preceding March 1, 1981.

■ The next phase in Ms. Sennello's employment history began on an unspecified date in March 1981, when she accepted a job selling advertising for a real estate publishing company called Real Estate Marketing. This job, in a field which Ms. Sennello admitted to having little prior knowledge about, cannot be regarded as comparable to her managerial work experience in the insurance industry. Moreover, there is no evidence that Ms. Sennello took this job only after exhausting possibilities in the insurance field. We therefore find that she failed to meet the statute's "reasonable diligence" standard in searching for suitable post-termination employment.

The appropriate formula for determining Ms. Sennello's back pay award during the period of her employment for Real Estate Marketing, from March 1 through September 30, 1981,[5] is suggested to us by the *Knickerbocker Plastics* line of cases. *Knickerbocker Plastics Co.,* 132 NLRB 1209, 1215 (1961); *NLRB v. Aycock,* 377 F.2d 81, 87–88 (5th Cir.1967); *Brady v. Thurston Motor Lines,* 753 F.2d 1269, 1279–80 (4th Cir.1985). Specifically, Plaintiff's back pay following the voluntary termination of substitute employment should equal her baseline back pay minus the *greater* of her actual earnings during the post-quitting period *or* the amount she would have earned if she had not left the interim job. In the present case, the position with Real Estate Marketing was the only gainful employment held by Ms. Sennello in 1981. We therefore infer that her total stated earnings for 1981—$9,256.00—derived solely from her seven months of employment for that firm. Her average monthly earnings from Real Estate Marketing therefore amounted to $1,322.28—somewhat more than the $1,211.30 per month she had made in her work for the World Insurance Company. Accordingly, we must calculate her back pay entitlement from March 1 through September 30, 1981, by subtracting $1,322.28 from a monthly baseline award of $2,746.64, leaving Ms. Sennello with $1,424.36 per month, or a total of $9,970.52 for that seven-month period.

Ms. Sennello's employment with Real Estate Marketing was cut short by the onset of a tumor-related illness which rendered her incapable of work for approximately four months—from October 1981 through February 1982. Plaintiff has presented no evidence which might effectively guide us in determining the degree to which she would have been compensated for such a period of disability if she were still employed at Reserve Life. At one point in her trial testimony, she briefly mentioned that Reserve Life had provided her with *partial* disability coverage, but she acknowledged

---

**5.** Once again, we are using the formula spelled out *supra,* in footnote 4, for setting employ-

ment-related dates which have only been designated by month rather than by specific date.

that she had not included this coverage in her fringe benefit calculations. Moreover, she utterly failed, on this or any other occasion, to illuminate the Court as to the nature and extent of this coverage. Lacking as we are in any reliable information as to Plaintiff's prior disability protection, we are unable to provide her with back pay recovery during the period of her illness-related unemployment, which we infer to have commenced on October 1, 1981 and to have run through January 31, 1982.

Following her illness, Ms. Sennello returned to the insurance field for the first time since she had left her job at the World Insurance company in December 1980. In February 1982, she began working for an insurance business owned by an unnamed friend. While we are given relatively sparse details about this employment, the available information *does* suggest that the work was suitable to Ms. Sennello's skills and prior work experience: she handled the sale of health and life insurance policies, dealing quite extensively with businesses as well as individual clients.[6] We are told that this employment was cut short by a four-month bout of phlebitis, from which Ms. Sennello did not recover until October 1982, when she resumed part-time work for another of her husband's businesses. From this information, we surmise that the onset of Ms. Sennello's phlebitis occurred in June 1982. Here again, for calculation purposes, we shall treat her work with the insurance company as having begun on February 1, 1982, and as having ended on May 31, 1982. Moreover, as we have no indication that Ms. Sennello was paid for the part-time work which she performed for her husband following her phlebitis attack, we shall assume that her stated earnings for 1982—amounting to $11,337.00—derived in their entirety from her four months of employment with her friend's insurance business.

Given the comparability of Ms. Sennello's work for her friend's insurance business to her prior work at Reserve Life, we find that she is theoretically entitled to back pay for the four-month period of her employment by this business, amounting to the baseline award minus her actual earnings. Her income statement and testimony have led us to infer, however, that she made $11,337.00 during her four months of employment in this capacity, with the result that her monthly earnings of $2,834.25 exceeded her monthly baseline back pay entitlement of $2,746.64. She can therefore collect no back pay award for the duration of this employment, from February 1 through May 31, 1982.

With regard to Ms. Sennello's four-month bout with phlebitis, we refer again to Plaintiff's failure to establish the terms of the disability protection which she claims very generally to have had while employed at Reserve Life. Accordingly, we must deny her back pay recovery during the time that she was unemployed due to this illness—from June 1 through September 30, 1982.

Details as to Ms. Sennello's part-time work for her husband following the phlebitis attack are wholly lacking. Once again, we are told nothing of the nature of her husband's business enterprise, nor are we given any information as to the duties performed by Ms. Sennello or her compensation, if any, for these services. Finally, Plaintiff has provided no clear indication that this work was the only form of employment activity which she could reasonably be expected to perform while still recuperating from the phlebitis. We only know that she continued working part-time for the business until May 1983, when her husband sold it. Again for computation purposes, we infer that Ms. Sennello ceased this part-time work as of April 30, 1983. Given the absence of any evidence that Ms. Sennello exercised the requisite diligence in taking this part-time work with her husband rather than returning to the insur-

---

6. We note, in passing, that the Defendant has not specifically challenged the comparability of this work to Ms. Sennello's previous managerial work for Reserve Life; indeed, in disputing Plaintiff's claims to back pay entitlement, the Defendant has only asserted in general and conclusory terms that "she failed to seek any management level insurance job from 1982 forward." [Defendant's Post Trial Memorandum of Law, at 12.]

ance field, we find no basis for awarding her any back pay for this period.

In May 1983, Ms. Sennello opened a small insurance agency called Gendra Sennello Associates. As discussed in our Findings of Fact, this agency began as a one-person enterprise, but Ms. Sennello gradually hired a small number of brokers to work for her. Ms. Sennello continued to run and profit from this business as of the time that this case was tried, on September 3–9, 1986. In 1986, her estimated income from Gendra Sennello Associates totaled $400 to $500 per month.

In addition to running Gendra Senello Associates, the Plaintiff accepted full-time employment with a real estate marketing firm called Florida Showcase Publications, in December 1985. She headed up a sales staff for this enterprise, and at the time of the trial, she reported earnings of approximately $500 per week from this employment alone.

The founding and development of an insurance agency certainly fall within the realm of suitable post-termination employment under the case-law applying 42 U.S.C. § 2000e–5(g). Moreover, Ms. Sennello's continued operation of this agency while working in a well-paid position for Florida Showcase Publications constituted further suitable employment under the statute. Accordingly, she is entitled to baseline back pay reduced by her actual earnings from May 1, 1983 until the date of trial.[7] In 1983, she is therefore entitled to $25,768.73 —taking into account her $7,171.00 of declared earnings for that year. For 1984, a year in which she has reported earnings of $11,300.00, she shall be awarded $21,-659.73. The parallel figure for 1985, in which she earned $10,126.00, is $22,833.73 in back pay.

Statements made by Ms. Sennello as to her earnings in 1986 are contradictory. In her Statement of Losses [Plaintiff's Ex. 58], she listed her estimated income for that year as $20,000.00. In her trial testimony, however, she reported earnings of $500.00 per week from Florida Showcase Publications, and she estimated her earnings from Gendra Sennello Associates to be $400 to $500 per month. Taking her reported earnings from Florida Showcase Publications as accurate and assuming average monthly earnings of $450 per month from the insurance business, we find that Plaintiff's earnings for 1986 were, in fact, in the vicinity of $31,400.00. Pro-rating these earnings for the period commencing January 1, 1986, and ending on the final day of the trial, September 9, 1986, we find Plaintiff to have earned $21,678.56 during the relevant period. Subtracting this sum from $22,742.21, the baseline back pay award pro-rated for the same period, we find Plaintiff to be entitled to $1,063.65 in back pay recovery for 1986.

Aggregating the back pay awards specified in the preceding paragraphs, we find Plaintiff's total back pay award to be as follows:

| | |
|---|---|
| January 1, 1980—November 30, 1980: | $17,501.07 |
| December 1, 1980—February 28, 1981: | 4,606.02 |
| March 1, 1981—September 30, 1981: | 9,970.52 |
| October 1, 1981—April 30, 1983 | No Relief |
| May 1, 1983—December 31, 1983: | 25,768.73 |
| January 1, 1984—December 31, 1984: | 21,659.73 |
| January 1, 1985—December 31, 1985: | 22,833.73 |
| January 1, 1986—September 9, 1986: | 1,063.65 |
| TOTAL | $103,403.45 |

Pursuant to the above analysis, Plaintiff is hereby awarded a total of $103,403.45 in back pay as authorized under 42 U.S.C. § 2000e–5(g).

*2. Reinstatement*

■ Reinstatement is another form of relief appropriately awarded to individuals found to have been deprived of employment in violation of Title VII. The statute, quoted earlier, specifically includes "reinstatement ... with or without back pay" as one of the forms of "affirmative action" authorized in such cases. 42 U.S.C. § 2000e–5(g). The central role of reinstate-

---

7. Theoretically, a prevailing plaintiff in a Title VII action is entitled to back pay up until the date of final judgment. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1473 (11th Cir.1985). However, as we have no evidence of Ms. Sennello's post-trial earnings, we cannot fairly award her back pay beyond the date of trial.

ment in Title VII cases such as the one at bar has been discussed by the Eleventh Circuit:

> "[R]einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required." *Allen v. Autauga County Board of Education,* 685 F.2d 1302, 1305 (11th Cir.1982) (citations omitted). The rule of "presumptive reinstatement" in wrongful discharge cases follows the notion that money damages will seldom suffice to make whole persons who are unlawfully discriminated against in the employment environment. *Id.* at 1306.

*Darnell v. City of Jasper, Alabama,* 730 F.2d 653, 655 (11th Cir.1984); *see also Nord v. U.S. Steel,* 758 F.2d 1462, 1470, 1473 (11th Cir.1985) (Title VII claimants are presumptively entitled to reinstatement under the "make whole" policy articulated by the Supreme Court in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)).

So strong is this Circuit's commitment to reinstatement that it has called for this remedy even where it will result in the placement of the discriminatee in an antagonistic work setting. *Allen v. Autauga County Board of Education,* 685 F.2d 1302, 1305 (11th Cir.1982). In *Allen,* the Circuit reversed a lower court's denial of reinstatement to two non-tenured public school teachers whose contracts had been terminated in violation of 42 U.S.C. § 1983, in retaliation for their having circulated for signature by fellow teachers a letter to the state Superintendent of Education questioning the county school board's use of certain earmarked funds.

> This rule of presumptive reinstatement is justified by reason as well as precedent. When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored. Yet at the same time, there is a high probability that reinstatement will engender personal friction of one sort or another in almost every case in which a public employee is dis-

charged for a constitutionally infirm reason. Unless we are willing to withhold full relief from all or most successful plaintiffs in discharge cases, and we are not, we cannot allow actual or expected ill-feeling alone to justify nonreinstatement.

*Id.* at 1306.

In keeping with the unequivocal directives of the Eleventh Circuit on the right of an unconstitutionally discharged employee to reinstatement, we deem it appropriate in the present case to order the reinstatement of Ms. Sennello to a managerial position with Reserve Life comparable to that which she held prior to her wrongful demotion and subsequent firing some seven years ago. While we recognize that a geographically proximate position suitable to Ms. Sennello's skills and prior work experience may not be immediately available, the Defendant is ordered to place Ms. Sennello in such a position, if she so wishes, within a reasonable period of time.

## III. CONCLUSION

In sum, it is hereby ORDERED AND ADJUDGED as follows:

1. The Defendant shall pay to the Plaintiff a total of $103,403.45 in back pay as authorized under 42 U.S.C. § 2000e–5(g); and

2. The Defendant shall reinstate the Plaintiff in a managerial position which is geographically proximate and is suitable to her skills and prior work experience.

3. The Plaintiff shall submit to the Court a proposed order of final judgment in this cause within seven (7) days of the date of this Order.